Melvin PAXTON, Jr., Plaintiff,

v.

UNION NATIONAL BANK, A Corporation, Defendant,

Katrina Terry, Phyllis Mosley, Jerry Riley and George Spann, Intervenors.

Harold Dominic BROWN, Plaintiff,

v.

UNION NATIONAL BANK OF LITTLE ROCK, Defendant.

Norman WILLIAMS, Plaintiff,

v.

UNION NATIONAL BANK, A Corporation, Defendant.

Nos. LR–76–C–110, LR–C–78–330 and LR–C–76–239.

United States District Court, E. D. Arkansas, W. D.

May 26, 1981.

---

John W. Walker, P. A. Hollingsworth, Little Rock, Ark., for plaintiff.

James E. Darr, Jr., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

Melvin Paxton filed an individual and a Rule 23 class action suit against the Union National Bank on April 12, 1976 (LR–76–C–110). Jurisdiction was invoked pursuant to 28 U.S.C. §§ 1343(4), 2201 and 2202 and 42 U.S.C. §§ 1981 and 2000e–5(f). The latter sections are part of Title VII of the Civil Rights Act of 1964. The complaint charged that the bank had discriminated against plaintiff and the class he represents on the basis of race or color in hiring, testing procedures, promotions, raises and job assignments. After some preliminary skirmishing, the bank answered on June 27, 1977 and denied the allegations of the complaint. On June 12, 1979 Katrina Terry and Phyllis Mosley, former bank employees, were permitted to intervene in this cause by order of Chief Judge G. Thomas Eisele and to assert charges of racial discrimination. Katrina Terry alleged that she was denied advancement opportunities and promotions because of her race. Phyllis Mosley made the same allegations and in addition claimed that she was discharged for racial reasons. Jerry

Riley, Bobby Scott and George Spann were permitted to intervene in this cause on October 30, 1979. Riley and Scott are present employees of the Bank, and Spann is a former employee. These intervenors alleged racial discrimination on the basis of promotions, raises and work assignments. The bank has denied the allegations of the intervenors. On July 19, 1976 Norman Williams filed a complaint against Union Bank invoking the same code sections as Paxton and making similar allegations (LR–76–C–239). On September 20, 1978 this case was consolidated with the Paxton case (LR–76–C–110). On September 25, 1978 Harold Dominic Brown filed an individual and class action suit against the Union National Bank alleging jurisdiction under 42 U.S.C. § 2000e et seq. and a broad spectrum of discrimination employment practices on the part of defendant bank (LR–C–78–330). On October 16, 1978 the bank filed its answer denying the allegations of the complaint. On August 28, 1979 Chief Judge Eisele ordered a consolidation of the Brown case (LR–C–78–330) with the Paxton case (LR–76–C–110). Bobby Scott, one of the intervenors in the Paxton case, settled his intervention and was dismissed from the litigation by order of Judge Eisele on April 3, 1980. The consolidated cases were set for trial before Chief Judge Eisele on April 7, 1980. At the outset of the trial, the case of Norman Williams v. Union National Bank (LR–C–76–239) was dismissed without objection by Judge Eisele under Rule 41(b) Fed.R.Civ.P. The status of the litigation was then as follows. The case of Harold Dominic Brown v. Union National Bank (LR–C–78–330) had been consolidated with Melvin Paxton, Jr. v. Union National Bank (LR–76–C–110). In the latter case there were four remaining intervenors—Katrina Terry, Phyllis Mosley, Jerry Riley, and George Spann. Judge Eisele decided that he would take testimony in this matter on both the class action and individual claims and issue such further orders as was justified by the evidence. He took testimony on April 7 through April 11, April 14, 15 and 18, August 12, 13, 14, 15, 19, 20 and 21, all in 1980. After these 15 trial days, Chief

Judge Eisele recused in this case on August 21, 1980. His reasons for doing so are set forth in a lengthy memorandum dated September 4, 1980 and will not be repeated here. On September 18, 1980 Chief Judge Donald P. Lay of the Court of Appeals of this Circuit assigned the case to me. It was set for a continuation of testimony on April 7, 1981. By letter dated November 12, 1980, I advised counsel of my unwillingness to rehear the evidence heard by Judge Eisele. The parties were directed to furnish me with a complete transcript of the testimony by February 1, 1981. Cost of the transcript was to be shared on the basis of one-half by the bank and one-half by the plaintiffs and intervenors. I reserved the right to tax the entire transcript cost on the losing party. Testimony was begun before me on April 7, 1981 and continued through April 9. It was resumed on April 13 and continued through April 16; resumed on April 20 and concluded on April 23—a total of eleven days of trial time extended over three weeks. If this time is added to Judge Eisele's trial time of fifteen days, it will be seen that 26 days have been spent in trial time alone. This does not include the time spent in several pre-trial conferences. The case has hardly justified such a large expenditure of judicial time and resources, not to mention the time, trouble and expenditure of the parties and their counsel. After carefully reading the transcript of the testimony taken before Judge Eisele and after hearing eleven days of testimony, during which copious notes were taken, I have some difficulty in understanding the wisdom of filing and proceeding with this lawsuit. There are undoubtedly a number of employers in this district who are discriminating against their employees, but Union National Bank would not seem to be one of them—at least not from the evidence produced by plaintiffs and intervenors in this case.

I find the claims of the plaintiff and the intervenors to be without merit on an individual or class action basis. This bank has aggressively pursued affirmative action during the period in question. The case developed by the plaintiffs and intervenors has a number of fatal flaws. One of the most glaring is that inadequate discovery was undertaken, with the result that the major portion of plaintiffs and intervenors' case consisted of in-court discovery of bank officials. The lengthy examination of these adverse witnesses produced little evidence of value to plaintiffs and intervenors but much evidence that was very harmful to their cause. This trial tactic did result in a great expenditure of trial time. After plaintiffs' counsel had examined Joseph E. Zegler, the bank's personnel director, as an adverse witness for an entire week, Chief Judge Eisele made the following comments, which I consider very apropos:

> [W]hat I am concerned about is that the questions reveal that discovery that should have been made either wasn't made or is not available to Mr. Walker in many respects because he has asked if the man knows something about it. He finds out that he doesn't. Had he asked during the discovery period he would have found it out and he wouldn't have to take the Court's time to know that. He could have done it by other means. So to a large extent this week has been in essence a discovery of the limits of this man's knowledge, much of which is very limited and which he has demonstrated he would not be the appropriate witness to make the proof that Mr. Walker seeks to make, but which could be made by the proof.
>
> I feel that it has gone on tremendously long in comparison to the meat that has come out of it in terms of the facts. To have the witness state over and over that he doesn't know, that he would have to look at his records, that he doesn't recall when there are other witnesses who obviously would know this information and should be called for that purpose, it seems to be an imposition upon the Court. (T. 918–19)

Even more harmful to the plaintiff and intervenors were some of their own witnesses. Mike Mothershed is a good illustration. Mr. Mothershed, a black, is now the night supervisor of computer operators at

the bank. He has two blacks and eight whites under his direction—two lead computer operators, two computer operators, one computer operator trainee, four distributors and balance clerks and one data librarian. He could hardly be insensitive to discrimination against blacks because his sister, Thelma Mothershed, was one of the eight black students who braved an unruly and abusive mob, encouraged by unscrupulous demagogues, to integrate Little Rock Central High School in 1957. Mothershed denied that the bank had been guilty of discriminatory practices toward him or other employees. His own career at this bank substantiates his testimony. Mothershed was hired by Union National Bank after he was discharged by First National Bank for which he candidly admitted was a mistake on his part. He testified that Mr. Zegler at Union Bank had given him another chance when he needed a job. Mothershed was hired as a messenger in the mail room on April 13, 1975 at $380.00 monthly. In the six years of his employment, Mothershed has had six promotions and eleven salary increases (Def. Exh. 80). He is now earning $1,400 a month. Mothershed testified that he had at one time registered a discrimination complaint because he felt that a white employee had been moved ahead of him, but that the bank had established to his satisfaction that its decision had been based on the superior knowledge and experience of the other employee. Testimony had been elicited that Mothershed had been the subject of discrimination because he had not been made a computer programmer. However, Mothershed testified that he had been offered that opportunity but had declined because he was not interested in becoming a computer programmer. He also testified that he had specifically requested the night shift assignment.

Another damaging witness called by the plaintiff and intervenors was Mrs. Mildred Hall, a black supervisor of the collection department at the bank. She had worked in the Treasurer's office at Sears Roebuck in Chicago, 1966–78, but married a Little Rock resident and moved to Little Rock in 1978. Mrs. Hall denied discrimination in her own case and that of other employees. All employees under her supervision are white.

Two other blacks, called by plaintiffs and intervenors as adverse witnesses, seriously damaged their case—William Pierce and Charlotte Johnson. William Pierce has been a Senior Vice President of this bank since 1975. He had previously been executive director of the Arkansas Business Development Corporation and was for many years a field representative for the Arkansas Farm Bureau Federation. Pierce has been Chairman of the Board of the Little Rock Branch of the Federal Reserve Bank and has been a member of the Board of the Federal Reserve Bank. Plaintiffs and intervenors through their witnesses have tried to portray Pierce's employment as window-dressing. He is described as having no real duties or function at the bank. We reject this image. Pierce is a college graduate with a wide background in the Arkansas farming and business community, particularly in its black segment. Pierce is undoubtedly a considerable asset to Union Bank both as an executive and as a source of black business. Pierce testified as to the bank's aggressive affirmative action program after the control of the bank was assumed by Mr. Herbert McAdams about ten years ago. He testified as to the bank's continuing efforts to recruit black employees and to train prospective black employees. He testified that he is in constant communication with the personnel office with regard to the hiring and promotion of black employees. He used a chart of the bank work force of March 31, 1980 (Joint Exh. A) to illustrate wide dispersement of blacks through virtually all the bank's departments. He testified that even where the chart showed totally white departments, there had been blacks employed in these departments. An example he cited was auditing, shown to be completely white on March 31, 1980. Andrew Green, a black had been assistant auditor, the second job in the department. Pierce testified that the bank planned to promote Green to auditor upon retirement of the bank's chief auditor.

This was confirmed by other testimony and by Green himself, who left the bank to take what he considered to be a better job. Pierce denied discriminatory treatment of blacks at Union Bank. He concluded his cross-examination with this statement: "I don't think there's another bank in the area that can match what Union is attempting to do and has done [in affirmative action efforts]."

Mrs. Charlotte Johnson, another black witness called by plaintiffs and intervenors as an adverse witness, works in the bank's personnel office. She actually screens applicants to determine if further interest in their applications on the bank's part is justified. Mrs. Johnson testified that to her knowledge the bank had never mistreated an employee on account of race and no employee had ever complained to her in this regard. She knew of no instance where the bank had failed to promote an employee because of race or had discriminated in any regard because of an employee's race. I was impressed by the intelligence and forthrightness of this witness. In early 1979 Mrs. Johnson resigned from the bank to work in the office of Governor Bill Clinton. At the end of his term in January of 1981, she returned to the personnel office of the bank in her former capacity.

Besides the plaintiffs and intervenors themselves, who are the subject of detailed findings, *infra*, the case against the bank depends upon the testimony of Bobby Scott, Edith Williams, Tommy Sproles, Ralph Martin and two experts. Scott was originally an intervenor in the Paxton case but settled his case on the eve of the trial and is no longer a party. After strong criticism for his work performance (Def. Exh. 78(a)), Scott was discharged by the bank on April 24, 1979 for failing to call his supervisor when absent from work on three consecutive days—a violation of bank rules. At his unemployment compensation hearing, the bank discovered that a white employee had been guilty of the same infraction and had not been fired. The bank then reinstated Scott with back pay. He was given another chance as a computer operator trainee on May 14, 1980 (Def. Exh. 78(b)), and he is now a computer operator on the day shift. After 7 months as a computer trainee on a previous occasion, he had failed to master the job and was returned to his former job as a distribution clerk. He blamed his failure on poor rapport with the operator who was training him, and the bank agreed to give him another chance on May 14, 1980 (Def. Exh. 78(b)). Scott displayed a great deal of hostility toward the defendant bank. For instance, he refuses to keep his own money in Union but is the customer of a competitor. He showed considerable resentment at having been called on the carpet for overdrafts and claimed that others had been guilty of overdrafts with impunity. Scott felt that he had individually been the object of discrimination by the bank. We need not explore this subject because his case was settled and he is no longer an individual litigant. His testimony would of course bear on the class allegations. We find it unpersuasive. He began work as a file sorter, an entry level job, on May 24, 1977 and has had a series of promotions and raises to his present position as computer operator. Scott's testimony consisted of criticism of the bank's policies in promotions and raises given to various employees in comparison to those awarded to others. With little direct knowledge of the reasons behind the management's personnel decisions, Scott draws sweeping inferences of discrimination. His testimony is based on gossip, hearsay and is generally unsubstantiated. His criticism of the bank's personnel actions in various individual cases has been effectively rebutted by the bank's records and witnesses and in some instances by the alleged discriminatees.

Even more unpersuasive is the testimony of Edith Williams. Ms. Williams worked as a secretary less than a year at the bank from September, 1976 to August, 1977, at which time she resigned. Documents from Ms. Williams' personnel file reflect that from the inception of her employment she was a serious disciplinary problem. She was unable to get along with either her supervisors or co-workers. She wrote belligerent notes to bank officers (Def. Exh.

82), refused to redraft a document when ordered by her supervisor (Def. Exh. 82), failed to shred material in violation of bank rules (Def. Exh. 83), performed her work poorly (Def. Exh. 84, 90), absented herself from her job without permission (Def. Exh. 85), could not or would not follow directions (Def. Exh. 86) or take direct orders from her supervisor (Def. Exh. 87), and engaged in long personal telephone calls on bank time (Def. Exh. 88, 89). In the eleven months of her employment, Edith Williams was the subject of ten critical memos from her supervisor to the personnel department. As noted above, these covered a wide spectrum of insubordination and poor work performance. Like Bobby Scott, this witness made a number of vague, unsubstantiated charges of discrimination on the bank's part based on gossip and hearsay. Against the bank's charges of her own short-lived, poor work performance at Union Bank, her own criticisms of the bank's policies are entitled to scant weight in the evidentiary scale.

Mr. Tom Sproles, a black, was hired by Union National Bank as a branch manager on January 11, 1977 at a salary of $14,400. Incidentally, this was the highest salary paid to any branch manager; most of the white branch managers were paid $10,000 or less (Def. Exh. 7). At that time he was branch manager at First National Bank in Little Rock. He resigned July 7, 1979, after being severely criticized over an incident when he failed to properly document a loan and caused the bank to lose somewhere between $59,000 and $80,000. Until this incident Sproles had been a highly satisfactory employee, and there is no evidence of any friction with senior officers or any criticism of the bank for treatment of him or others. He was an officer making $17,400 a year with a $1500 expense account and various other fringe benefits. Sproles probably had a fine future with this bank until he made an egregious error, which would have cost him his job at many business institutions. The bank, however, did not discharge or demote him. It did justifiably criticize him. He took umbrage at the criticism and resigned. Like Bobby Scott and Edith Williams, he now makes nonspecific charges of discrimination against the bank. He named eight blacks against whom he claimed the bank had discriminated. They were Bill Pierce, Bob Donaldson, Wanda Jackson, Ralph Martin, Brenda Easterling, Jackie Jones, Diane Lefere, (T. 1906) and Jann Henderson (T. 1945). Pierce's testimony has been discussed, *supra*. He is a senior vice president of the bank. He has denied any discrimination on the bank's part to him or anyone else. The only one of the others who testified is Ralph Martin, and his testimony will be discussed presently. It should be noted, however, that Pierce, Bob Donaldson, Wanda Jackson and Jann Henderson are all presently officers of the bank. Donaldson is a branch manager, and Ms. Jackson is an installment loan officer. Jann Henderson is the commercial loan documentation officer with the responsibility of documenting loans as large as several million dollars. She is a highly regarded employee who was recently offered a position as a commercial loan officer. She turned down the offer because she did not want the responsibility of approving large loans. Brenda Easterling, formerly an assistant branch manager, is now a courtroom deputy in the U. S. District Clerk's office at Little Rock, Arkansas. She was employed as a teller trainee on March 24, 1976 and was later promoted to teller and assistant branch manager on July 1, 1979. In the three years of her employment, she received six salary increases. Her name was suggested in connection with the recusal of Judge Eisele, at which time plaintiff's counsel expressed an intention to call her as a witness. She was never called nor was Ms. Jones or Ms. Lefere. When pressed for specific instances of discrimination, Sproles' testimony proved untrustworthy. He was asked why he considered that the bank had discriminated against Bob Donaldson. He replied that Donaldson had been a branch manager trainee for 18 months before being made a branch manager (T. 1981). This testimony proved to be completely incorrect. Donaldson was a trainee for six months before being made a branch manager (Def. Exh. 8). Since Don-

aldson's employment at the bank on June 1, 1976 as a management trainee, he has had two promotions and six salary increases (Def. Exh. 9). As noted above, he is now a bank officer.

Ralph Martin, called as a rebuttal witness, was employed at the bank in August, 1976 as a management trainee at a salary of $650 monthly. He resigned on January 2, 1980, at which time he had moved up to installment loan officer and was making $11,700 annually. He left the bank to take a job with Western Electric as a staff associate at $17,900 annually, an increase of $6,200 in salary. Martin's testimony is subject to the same objection as that of Sproles. He made general allegations that the bank discriminates against blacks, but he was difficult to pin down as to specifics. His testimony does not effectively rebut in any sense the strong defense made by the bank.

As is evident in the findings set forth *infra*, we have given great weight to the testimony of defendant's expert, Dr. James Gwartney, an economics professor from Florida State University. Dr. Gwartney has master and doctoral degrees in economics from the University of Washington. His areas of specialization are labor economics, economics of discrimination and micro-economics. He is the author of seven books and numerous articles published in the major professional journals of his areas of specialty (Def. Exh. 18). One of his articles, entitled "Statistics, the Law, and Title VII—An Economist's View," was published in the *Notre Dame Law Review* and was introduced in evidence (Def. Exh. 19). Dr. Gwartney's in-depth analysis of the issues in this case was most impressive. Actually, the only area in which Dr. Gwartney was seriously challenged by the two experts called by plaintiffs and intervenors was the area of discharge. Dr. Frank James, a math professor at the University of Arkansas, was the principal expert witness against the bank. He has a master's degree in math from the University of Arkansas and a doctorate from New York University. The approach of Dr. James to the issues in these cases was purely statistical. This is understandable since his entire academic background has been in the field of math and statistics. He has had no academic training in the field of labor economics, labor discrimination, employment discrimination statistics, or labor relations. The statistical analysis made by Dr. James was in many respects favorable to the bank. Dr. James admitted that the number of blacks employed at Union Bank was higher than black representation in the work force in the area. His figures showed that the bank is hiring almost twice the number of blacks percentage-wise as their representation in the work force—26.2% black hirees against 15.3% blacks in the work force (Pls. Exh. 7). His figures also show that the bank hired 26.29% blacks in the five-year period 1974–78 and only 22.8% of the blacks terminated. On the other hand, during this same period of time 73.8% whites were hired and 77.2% whites terminated. These figures show that whites are terminated at a faster rate than blacks at this bank. With reference to these figures, Judge Eisele made the following comment with which the witness agreed:

THE COURT: And the effect will be if that continues is that the white population in the enterprise will decrease and the black population is increasing, because even though they have like you pointed out a high rate of discharges, the terminations which cover them all shows that more blacks are being hired than are leaving and the reverse for the whites. Less whites are being hired than are leaving. So over a period of time the population of blacks—

THE WITNESS: Would tend to increase marginally while the whites would tend to decrease.

That trend is shown in Table 1 in terms of the percentage. If you consider the years '73 through '77, you will find a constant decrease in the white percentage and a fairly constant increase or at least a larger percentage in the '75, '76 and '77 black population. (T. 2139)

There was only one statistical area from which Dr. James could infer discrimination

on the bank's part. This was in the area of discharges. In the period 1974–78 there were 117 discharges, 53 of which were black and 64 white. This undoubtedly showed a higher representation of blacks among those discharged in proportion to their representation in the bank's work force. An inference of discrimination is possible if we look at the bare statistics. In view of the bank's nondiscriminatory statistical performance in all other areas (hirees, initial job assignments, initial salary, promotions, salary increases, terminations, warnings, and discharges), the discharge figures are worthy of further analysis. Dr. Gwartney subjected these figures to such further analysis; Dr. James did not. For instance, Dr. Gwartney examined the discharge rate of those employees who had been with the bank at least two years. In this group of employees, there was no significant difference in the rate of discharge as between whites and blacks. In other words, Dr. Gwartney demonstrated that the high incidence of black discharges occurred during the first two years of their employment. (Seventy out of seventy-seven of the black discharges from 1974 through 1980 occurred within the first two years of employment.) He also demonstrated through a series of tables set forth *infra* that there is a disproportionate number of black discharges only where the black had been hired in the same year as the discharge. The discharge figures are susceptible of one or two inferences. One is that the bank is discriminating against blacks in the area of discharges. Another is that the bank was an aggressive affirmative action employer who hired "high risk" black employees at a far higher rate than their qualified representation in the work force. Some of these black hirees are predestined to failure by virtue of such overrepresentation in their numbers. It is logical that their failures would occur in the first year. When a bank is hiring blacks at two or three times the expected rate and taking greater risks on black employees, some of these underqualified and undereducated hirees are not going to become suitable employees. These deficiencies in the sophisticated atmosphere of a bank will be-come quickly evident, and they will be discharged within the first year of their employment.

We accept the latter explanation for the high rate of discharge of short-term black employees. We reject the hypothesis that the rate of discharge of short-term black employees indicates discrimination on the bank's part. If the bank wanted to discriminate against blacks in the matter of discharge, it is inconceivable that it would discriminate only against a certain small group—the short-term employees. We also rely on some further analysis by Dr. Gwartney in accepting the nondiscriminatory explanation. Dr. Gwartney made an analysis of the number of warnings given to blacks prior to discharge vis-a-vis those given to whites. He found that blacks were given more warnings per discharge than whites. In other words, whites were more likely to be summarily discharged. The statistics illustrating this fact are set forth *infra*. Dr. Gwartney also analyzed in detail each of the discharges during the pertinent period—black and white—as to their factual background. Both from his analysis and from other evidence presented by the bank, we are satisfied that there were reasonable objective facts supporting the decisions to discharge and that the decisions were unrelated to race.

Dr. John Fluker, the other expert called by plaintiffs and intervenors, took the same position as Dr. James in relation to discharges. We reject his conclusions from the discharge figures for the reasons set forth above. Dr. Fluker also concluded that the bank had discriminated because the mean starting salary at the bank was $531 for blacks and $656 for whites. We reject this comparison because Dr. Fluker took all the employees hired at the bank and made no attempt to compare whites and blacks hired in the same category of employment. Dr. Gwartney did make the latter type of comparison and found no significant difference in entry salaries for whites and blacks. Dr. Fluker also concluded there was discrimination in the fact that on June 1, 1979 there were three black officers and 77 white

officers at the bank (there are more now). Since there were 80 officers out of 408 employees (of which 71 were black), Dr. Fluker concluded that there should be 14 black officers. We reject this kind of bare "warm body" statistical approach in making this analysis. Dr. Fluker did not consider availability of officer-qualified personnel in the work force. He also assumed that the capabilities, education and training of blacks and whites in the bank work force was equal. These later assumptions were patently unjustified by the evidence developed in this case.

In short we completely reject the claims of the plaintiffs Paxton and Brown and the intervenors that the defendant has discriminated against them. The proof to the contrary is overwhelming. We reject the class action allegations because the requirements of FRCP 23 have not been established by proof adduced on behalf of plaintiffs and intervenors. In support of these conclusions, we make the following specific findings of fact and conclusions of law. In these findings the abbreviation SMSA is used for Standard Metropolitan Statistical Analysis, a grouping used by the Census Bureau and the Arkansas Employment Security Division.

## FINDINGS OF FACT

1. Herbert H. McAdams, an attorney and successful northwest Arkansas Banker, acquired a controlling interest in Union National Bank of Little Rock approximately ten years ago after the bank had undergone a period of instability and mismanagement.

2. Among the reforms he instituted at this bank was an aggressive affirmative action program. While there was an affirmative action program at the bank, Mr. McAdams expressed the desire to have it sharply improved. Mr. Joseph E. Zegler was brought into the bank on March 3, 1973 and given a direct mandate by McAdams to institute a comprehensive affirmative action plan. Mr. Zegler has applied himself conscientiously and sincerely to this task. Zegler has also instituted personnel office reforms in the area of job descriptions, sala-ry grades, salary review and job evaluation. He also prepared a personnel policy manual (Def. Exh. 3), which contained the following statement under "Equal Opportunity Policy":

It is the policy of Union National Bank to implement affirmatively equal opportunity to all qualified employees and applicants for employment without regard to race, creed, color, religion, or national origin. Positive action shall be taken to insure the fulfillment of this policy, including: one, hiring, placement, upgrading, transfer, or demotion; two, recruitment, advertising or solicitation or employment; three, treatment during employment; four, rates of pay or other forms of compensation; five, selection for training; six, termination. This policy is consistent with the requirements and objectives set forth by the presidential Executive Orders.

Our objective is to obtain individuals qualified and-or trainable for positions by virtue of job-related standards of education, training, experience and personal qualifications. Responsibility for insuring compliance and implementation of the bank's policy on equal employment opportunity is assigned to the personnel director. The Executive Committee will review this policy every 12 months and measure the results against the stated objectives.

3. In the bank's hiring and promotion policy since Mr. McAdams acquired control of the bank and particularly since Mr. Zegler became personnel manager, the following factors have been considered in hiring and promotion: education, experience and job performance. There is no credible evidence that race has played a part in either hiring or promotion at this bank. However, since the plaintiff and all of the intervenors were actually hired by the bank, we do not consider this a case of discriminatory hiring in either an individual or a class action sense.

4. The bank has had an active recruitment policy for black applicants and has sent integrated recruitment teams of bank

employees to the predominantly black colleges in this area—University of Arkansas at Pine Bluff, Philander Smith at Little Rock, and Lemoyne-Owen in Memphis, Tennessee. These teams have also visited predominantly white colleges such as Ouachita Baptist at Arkadelphia, Arkansas.

5. The bank operates in-house training programs and offers other training programs in cooperation with various banking associations and educational institutions. For instance, the bank sends 15–20 people to a data processing school at Arkansas Tech College each year. There is a teller training school, and all employees are encouraged to attend American Institute of Banking classes. The latter classes are held in Little Rock during spring and fall semesters and consist of three-hour courses one night of the week for 14 weeks. Participation in the AIB courses is voluntary. Blacks do not participate in AIB courses in the same percentage as whites, but both races are actually encouraged to participate in this program. The bank also sends employees to the Arkansas Basic School of Banking, which is held each summer in two one-week sessions at Little Rock. This school deals with the fundamentals of banking. The bank also sends employees to graduate banking schools at Rutgers, LSU and SMU. There are intensive in-house training programs held during banking hours that cover a wide range of banking subjects. All of these training programs are available to blacks as well as whites, and there is no evidence of discrimination by the bank in the selection of participants in these various training programs.

6. Every week the bank published an in-house news letter called "Who's Where." It lists all personnel transfers, promotions, terminations and openings and the new employees.

7. The bank leadership in late 1974 or early 1975 decided that there were disadvantaged people in the community who could be made more attractive to the banking community if they had some banking training. In conjunction with the Opportunities Industrialization Center, the bank established a course in basic training for blacks. The bank provided instructors and textbooks and defrayed all the costs of this program. It was the intent of the bank to provide these blacks with knowledge and skills that would make their likelihood of finding employment in banking more probable. This was the first involvement of OIC with banking and banking training for minorities in the Little Rock area. Classes were first held in the OIC classroom and then on-the-job training was given at Union Bank. All classroom instructors were Union Bank officers and employees. The program lasted twelve weeks, of which an eight-weeks period was classroom training and a four-weeks period was on-the-job training. Fifteen black students comprised the initial class and were all selected by the OIC. Although Union Bank made it clear that it was not obligated to hire any of these participants, it did in fact hire the entire first class, which was conducted in the summer of 1975. Some went into teller training, some into account services and some into the computer center. Four similar classes were conducted, and the bank hired participants from subsequent classes, but in diminishing numbers. The bank also operates a tuition refund program under which they will refund 75% of an employee's expenses for courses related to banking that are taken at a college or business school.

8. The banking industry is a low-salaried industry and has a problem in competing for competent personnel with highly unionized industries such as Southwestern Bell and Teletype Corporation. Neither is its salary scale comparable to utilities such as Arkansas Power & Light Company and Arkansas Louisiana Gas Company. Bank salaries are also consistently lower than comparable positions in state, local and federal government. For this reason there is a large turnover of employees in the banking industry in central Arkansas. While Union Bank pay scales are comparable and competitive with other banks in central Arkansas, it shares with the latter the problem of attracting and holding desirable employees.

9. The bank has a discipline policy which is spelled out in its personnel policy manual and in its supervisor course. If an employee's performance is not satisfactory, the supervisor first advises the employee orally. If the sub-par performance continues, the employee is advised in writing of the specific criticism. If this does not work, a plan for improvement is instituted in which the supervisor and employee sit down, discuss the problem and what steps are needed to correct it. The next step, called a notice of disciplinary probation, involves a formal notice in writing of the need to correct the employee's deficiency. This notice is discussed personally with the employee and is signed by him. At this point the employee is placed on probation and given a specified number of days, usually between thirty and ninety, to take corrective action. If all these measures have failed, dismissal is considered. There are nine division heads, fifty-six department heads and sixty-nine supervisors in the bank. If there is a flagrant offense, the supervisor is authorized to terminate an employee on the spot. A flagrant offense is described by the bank's personnel director as theft, fighting, threatening a customer, refusing to follow a reasonable order or something of a similar nature. Otherwise, the decision to discharge is made only by the personnel director, the division manager and the department head in joint consultation. In the event of a disagreement, the final decision to terminate is made by the personnel director, who can be overruled only by the executive vice president. The written memoranda with respect to discipline goes into the employee's personnel file.

10. Authority over promotions and transfers is within the nine division managers as long as the employee's department is within his division. If the promotion or transfer is from one division into another division, then the personnel department is involved in the decision. In seeking a promotion or transfer within the department or division, the employee would first deal with his supervisor. If he deserves promotion or transfer outside the department or division, he would first take it up with the personnel office, according to established bank procedures. In the latter eventuality the personnel office makes an estimate of qualifications, finds if an opening exists and coordinates with the gaining and losing departments in the promotion or transfer.

11. The bank has about thirty persons in 10–12 feeder-type classifications. These are entry level positions where people are on some occasions hired with little or no experience. They are, however, hired by the bank with the idea that at some point in time they will be promoted out of the feeder-type position.

12. There are 175 job descriptions in the bank, which are constantly being revised. These job descriptions do not embrace bank officers. Officer status normally results from recommendation by the division head.

13. Mr. Zegler, the Personnel Director, and Mr. William Pierce, a black senior vice president of the bank, cooperated in starting a program at the University of Arkansas at Pine Bluff, which has primarily been a black college. Under this program, black students in distributive education were hired into the bank and hired for a semester to expose them to the field of banking. Members of the UAPB faculty were brought into the bank in order to adjust their curriculum to train students who could be brought into the bank and upgraded to responsible positions.

14. At the initiative of Mr. McAdams, Union was the first bank in this area to start a Minority Enterprise Small Business Investment Corporation. The bank began this organization with an investment of $75,000 in early 1973, which was half of the total amount put into MESBIC by other financial institutions. Capitalization of MESBIC is matched by the Small Business Administration to take high risk loans in which minorities are involved.

15. When the Arkansas Business Development Corporation, a black-administered program, was begun, Herbert McAdams was a member of the board. He played a key role in helping this organization succeed and made available space to it in the Union Bank.

16. Union Bank sponsored a series of meetings with black ministers of all denominations in Little Rock to assist them in setting up their books, learning how to make a proper financial statement, and making loan applications. These meetings were staffed by officers from the bank's Consumer Loan, Commercial Loan and Accounting Departments.

17. Mr. William Pierce, a black Senior Vice President of Union Bank, meets several times a week with Mr. Zegler, the Personnel Director, and Mr. Dierks, the Assistant Personnel Director, to discuss how blacks can be moved from entry level jobs to those of higher responsibility. They also discuss how blacks are succeeding in productivity and possible openings which can be filled by blacks (T. 1258). They have utilized charts similar to Joint Exhibit A to assess the dispersement of blacks throughout the bank in order to determine if blacks can be elevated to certain positions (T. 1259). These men have made strong efforts to involve blacks in every area of the bank, and there are now blacks in most departments (T. 1259).

18. The typical complaint of both white and black employees of the bank is poor pay. The banking industry does not pay well. Only when officer status is obtained, do employees come into a stream of pay that is commensurate with other businesses and other industry (T. 1262). This is the principal reason for the high turnover in bank employees. Mr. William Pierce, the black Senior Vice President, is a focus of these complaints from blacks. His counsel to them is to develop their skills through educational courses offered by the bank.

19. At the time William Pierce was made senior vice president of this bank, he was the only black to occupy such a position in a white-owned bank in the Eighth Federal Reserve District, which includes Arkansas and Texas and parts of the States of Missouri, Kentucky, Tennessee, Mississippi and Illinois.

20. A white employee of the bank was fired on the spot for using derogatory racial terms to a black employee (T. 1282).

21. If an employer is discriminatory against a group of people, it will manifest itself statistically in disparity between similarly situated employees or persons that are chosen out of a labor pool or a promotion pool. The following factors are important in determining if discrimination has been present: (a) comparison of the representation of blacks in the appropriate work force pools with blacks in the employer's work force; (b) representation of blacks among the hirees of the employer in comparison to blacks in the appropriate labor market pool from which the employer draws its employees; (c) comparison of the hiring salaries of blacks to hiring salaries of whites in similar positions; (d) comparison of promotions of blacks to promotions of whites; (e) comparison of terminations of blacks and terminations of whites; and (f) comparison of overall compensation to blacks to that of whites, that is, whether or not similar employees receive the same kinds of compensation.

22. According to the U. S. Census of 1970, the median years of schooling completed by professional and technical personnel is 16.2; accountants, 15.3; computer specialists, 15.5; bank officials and financial managers, 14.6; managers, salaried, 13.9; bank tellers, 12.6; bookkeepers, 12.6; file clerks, 12.4; office machine operators, 12.5 (Def. Exh. 20).

23. According to the 1970 U. S. Census, there are 27,148 blacks out of a total population of 175,157 (25 years of age or more) in Little Rock (SMSA) or a percentage of 15.5%. Of this group 98,964 completed 12 years or more of school, of which 8,042 or 8.1% were black. While 61.4% of the whites aged 25 years and over in Little Rock completed 12 or more years of schooling, only 29.6% of the blacks did so (Def. Exh. 21).

24. According to the 1970 United States Census, the representation of blacks in Little Rock (SMSA) in the various occupations involved in this litigation was as follows: Professional and technical workers as an entire classification, 8.7%. However, within this classification, 1.5% of accountants were black and 0% of computer specialists. 3% of the managers and administrators were

black, and 6.4% of the clerical workers were black. Within the latter classification, 4.5% of the bank tellers and cashiers were black, 0.6% of the bookkeepers and billing clerks, 4.5% of the file clerks, 5% of the secretaries and stenographers, and 6.4% of the typists (Def. Exh. 22).

25. According to a 1979 report of 16 Arkansas Employment Security Divisions, 6.3% of the Professional and Technical Employees (except for engineers, teachers, medical and health workers) in Little Rock (SMSA) were black. 2.7% of the managers and administrators and 6.1% of the clerical employees were black. 19.7% in all other occupations were black (Def. Exh. 23).

26. Pursuant to findings 22–25, it is further found that the availability of blacks in the various occupational and educational categories from which the bank draws its employees is approximately 6%–8%.

27. The representation of whites and blacks in the work force at Union National Bank, 1974–1980, is as follows:

No. of Employees as of December 31

| Year | Total | White | Black | Percent Black |
|---|---|---|---|---|
| 1974 | 332 | 293 | 39 | 11.8 |
| 1975 | 316 | 262 | 54 | 17.1 |
| 1976 | 343 | 288 | 55 | 16.0 |
| 1977 | 393 | 320 | 73 | 18.6 |
| 1978 | 408 | 336 | 72 | 17.7 |
| 1979 | 441 | 362 | 79 | 17.9 |
| 1980 | 432 | 358 | 74 | 17.1 |
| 1974–80 (Average) | 380.7 | 317.0 | 63.7 | 16.7 |

28. The representation of blacks in the work force at Union National Bank is approximately twice their availability in the occupations from which the bank hires intensely.

29. The representation of blacks in the work force at Union Bank at year end 1974–80 compared to their representation in the labor market pool is set forth *infra*. The acceptable range in the last column is derived by using the percentage of blacks in the labor market pool (column 1) as the benchmark. The acceptable range is the expected number of blacks (column 3) plus or minus two standard deviations. This procedure is in accordance with the technique approved by the Supreme Court in *United States v. Hazelwood School District*, 433 U.S. 299, 308, footnote 14, 97 S.Ct. 2736, 2742, footnote 14, 53 L.Ed.2d 768 (1977). The data on Union National Bank employees were derived from the employment history sheets provided by the bank for all employees present during 1974–80. The labor market pool data (column 1) are from the Arkansas Employment Security Division, *Manpower Information for Affirmative Action Programs—1979* (Table 3):

1975

| Occupation | Blacks as a Percent of the Labor Market Pool 1978 | Total No. of Employees UNB Work Force, 1975 | Expected No. of Black Employees | Observed No. of Black Employees | Acceptable Range (No. of Black Employees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 11 | 0.7 | 1 | 0.0– 2.3 |
| Managers & Administrators | 2.7 | 74 | 2.0 | 1 | 0.0– 4.8 |
| Clerical Workers | 6.1 | 214 | 13.1 | 46 | 5.9–19.1 |
| All others | 19.7 | 17 | 3.3 | 6 | 0.0– 6.6 |
| Total | -- | 316 | 19.1 | 54 | -- |

## 1976

| Occupation | Blacks as a Percent of the Labor Market Pool 1978 | Total No. of Employees UNB Work Force, 1976 | Expected No. of Black Employees | Observed No. of Black Employees | Acceptable Range (No. of Black Employees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 13 | 0.8 | 2 | 0.0– 2.6 |
| Managers & Administrators | 2.7 | 81 | 2.2 | 3 | 0.0– 5.1 |
| Clerical Workers | 6.1 | 234 | 14.3 | 45 | 7.0–21.6 |
| All others | 19.7 | 15 | 3.0 | 5 | 0.0– 6.1 |
| Total | -- | 343 | 20.3 | 55 | -- |

## 1978

| Occupation | Blacks as a Percent of the Labor Market Pool 1978 | Total No. of Employees UNB Work Force, 1978 | Expected No. of Black Employees | Observed No. of Black Employees | Acceptable Range (No. of Black Employees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 20 | 1.3 | 2 | 0.0– 3.5 |
| Managers & Administrators | 2.7 | 85 | 2.3 | 2 | 0.0– 5.3 |
| Clerical Workers | 6.1 | 295 | 18.0 | 64 | 9.8–26.2 |
| All others | 19.7 | 8 | 1.6 | 4 | 0.0– 3.8 |
| Total | -- | 408 | 23.2 | 72 | -- |

## 1979

| Occupation | Blacks As a Percent of the Labor Market Pool 1978 | Total No. of Employees UNB Work Force, 1979 | Expected No. of Black Employees | Observed No. of Black Employees | Acceptable Range (No. of Black Employees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 11 | 0.7 | 1 | 0.0– 2.3 |
| Managers & Administrators | 2.7 | 74 | 2.0 | 1 | 0.0– 4.8 |
| Clerical Workers | 6.1 | 214 | 13.1 | 46 | 5/9–19.1 |
| All others | 19.7 | 17 | 3.3 | 6 | 0.0– 6.6 |
| Total | -- | 316 | 19.1 | 54 | -- |

1980

| Occupation | Blacks As a Percent of the Labor Market Pool 1978 | Total No. of Employees UNB Work Force, 1980 | Expected No. of Black Employees | Observed No. of Black Employees | Acceptable Range (No. of Black Employees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 17 | 1.1 | 1 | 0.0– 3.1 |
| Managers & Administrators | 2.7 | 79 | 2.1 | 4 | 0.0– 5.0 |
| Clerical Workers | 6.1 | 311 | 19.0 | 65 | 10.6–27.4 |
| All Others | 19.7 | 25 | 4.9 | 4 | 0.9– 8.9 |
| Total | --- | 432 | 27.1 | 74 | --- |

30. If unemployed members of the work force were included in the above figure, the result would not be materially changed, since during the period in question, roughly 95 of the work force was employed (T. 2309–12).

31. The benchmark figures used above are substantiated by the fact that in 1973–74, 4.9% of those receiving a college degree in business and management were blacks and 4.6% of those receiving degrees in computer science were black. In 1975–76 the figures were 6.6% and 5.8% respectively (T. 2312–13).

32. Approximately two-thirds of the bank's work force is clerical. Based on availability of black clerical workers in the work force, the Union Bank in the years 1975–80 had about three times the number of such employees in its work force that would be expected (T. 2316).

33. During the years 1975–80 in every classification of occupation utilized by the bank, based on Arkansas Employment Security Division statistics, it is observed that representation of blacks at Union Bank exceeded the expected representation of blacks. For example, whereas in 1975 it would be expected that 19 blacks would be employed in the bank, actually 54 were in its work force; in 1976 the figures were 20 expected and 55 actually in its work force; in 1978, 23 were expected but 73 blacks were actually in the bank's work force; in 1979, 26 expected but 76 in the work force;

and in 1980, 27 expected but 74 in the work force.

34. During the period 1975–80, the representation of blacks in the bank's work force exceeds their representation in the total population of Little Rock (SMSA) and in the work force of Little Rock (SMSA).

35. If in fact the Union Bank was discriminatory against black employees during the years 1975–80, an underrepresentation of blacks in the various work categories and an underrepresentation of blacks in the aggregate work force would have been manifest in the figures quoted, *supra.* The opposite conclusion is evident from the figures.

36. The makeup of hirees of the bank during the year 1974–80 is shown by the following figures:

No. of Employees as
of December 31

| Year | Total | White | Black | Percent Black |
|---|---|---|---|---|
| 1974 | 194 | 159 | 35 | 18.0 |
| 1975 | 108 | 65 | 43 | 39.8 |
| 1976 | 175 | 131 | 44 | 25.1 |
| 1977 | 233 | 173 | 60 | 25.8 |
| 1978 | 211 | 171 | 40 | 19.0 |
| 1979 | 240 | 191 | 49 | 20.4 |
| 1980 | 174 | 137 | 37 | 21.3 |
| Total, 1974–80 | 1,335 | 1,027 | 308 | 23.1 |

37. The percentage of blacks among hirees set forth in finding number 37 is substantially greater than their representation in the Little Rock labor force and in the population of Little Rock. It is about three

times the black representation among persons who have completed a high school degree (8%) and substantially greater than representation among the clerical work force and among professional and clerical workers. To summarize, blacks have been hired by the Union National Bank at a greater percentage than their representation in any kind of benchmark that might be utilized.

38. If the hiring is broken down by job classification, we find that in the period 1974–80 the number of black hirees in each classification substantially exceeded the number of expected hirees. The following figures make the point:

1974–76

| Occupation | Blacks as a Percent of the Labor Market Pool 1978 | Total No. of Employees Hired by UNB 1974–76 | Expected No. of Black Hirees | Observed No. of Black Hirees | Acceptable Range (No. of Black Hirees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 11 | 0.7 | 2 | 0.0– 2.3 |
| Managers & Administrators | 2.7 | 33 | 0.9 | 3 | 0.0– 2.8 |
| Clerical Workers | 6.1 | 408 | 24.9 | 104 | 15.2–34.6 |
| All Others | 19.7 | 25 | 4.9 | 13 | 0.9– 8.9 |
| Total | -- | 477 | 31.4 | 122 | -- |

1977–78

| Occupation | Blacks as a Percent of the Labor Market Pool 1978 | Total No. of Employees Hired by UNB 1977–78 | Expected No. of Black Hirees | Observed No. of Black Hirees | Acceptable Range (No. of Black Hirees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 16 | 1.0 | 0 | 0.0– 2.9 |
| Managers & Administrators | 2.7 | 18 | 0.5 | 1 | 0.0– 1.9 |
| Clerical Workers | 6.1 | 394 | 24.0 | 94 | 14.5–33.5 |
| All Others | 19.7 | 16 | 3.2 | 5 | 0.0– 6.4 |
| Total | -- | 444 | 28.7 | 100 | -- |

1979–80

| Occupation | Blacks as a Percent of the Labor Market Pool 1978 | Total No. of Employees Hired by UNB 1979–80 | Expected No. of Black Employees | Observed No. of Black Employees | Acceptable Range (No. of Black Employees) |
|---|---|---|---|---|---|
| Professional & Technical | 6.3 | 7 | 0.4 | 0 | 0.0– 1.7 |
| Managers & Administrators | 2.7 | 14 | 0.4 | 0 | 0.0– 1.6 |
| Clerical Workers | 6.1 | 352 | 21.5 | 79 | 12.5–30.5 |
| All Others | 19.7 | 41 | 8.1 | 7 | 3.0–13.2 |
| Total | -- | 414 | 30.4 | 86 | --- |

39. A reasonable and proper inference from these figures is that the Union National Bank is aggressively and actively pursuing affirmative action policies and is making strong efforts to provide employment opportunities for blacks in the Little Rock area.

40. There is no significant black-white variation in the mean initial monthly salaries of full-time employees hired during the period 1974–78 as is illustrated by the following figures:

#### 1974–75

| Occupation | No. of Hirees W | No. of Hirees B | Mean Initial Monthly Salary W | Mean Initial Monthly Salary B | B/W Percent |
|---|---|---|---|---|---|
| Professional & Technical | 6 | 2 | $862 | $856 | 99.3 |
| Managers & Administrators | 19 | 1 | $1247 | $2500 | 200.5 |
| Sales Representatives | 1 | 1 | $575 | $475 | 82.6 |
| Collectors | 1 | 0 | $500 | – | – |
| Computer Operators | 9 | 1 | $462 | $450 | 97.4 |
| Secretaries | 9 | 3 | $514 | $442 | 86.0 |
| All Other Clerical Workers | 133 | 53 | $393 | $398 | 101.3 |
| All Other Workers | 0 | 3 | – | $390 | – |

#### 1976–77

| Occupation | No. of Hirees W | No. of Hirees B | Mean Initial Monthly Salary W | Mean Initial Monthly Salary B | B/W Percent |
|---|---|---|---|---|---|
| Professional & Technical | 10 | 0 | $1032 | – | – |
| Managers & Administrators | 19 | 3 | $1078 | $833 | 77.3 |
| Collectors | 2 | 1 | $600 | $575 | 95.8 |
| Computer Operators | 10 | 3 | $523 | $458 | 87.6 |
| Secretaries | 9 | 0 | $578 | – | – |
| All Other Clerical Workers | 206 | 82 | $470 | $449 | 95.5 |
| All Other Employees | 0 | 1 | – | $450 | – |

#### 1978

| Occupation | No. of Hirees W | No. of Hirees B | Mean Initial Monthly Salary W | Mean Initial Monthly Salary B | B/W Percent |
|---|---|---|---|---|---|
| Professional and Technical | 7 | 0 | $1328 | – | – |
| Managers and Administrators | 10 | 0 | $1058 | – | – |
| Sales Representatives | 1 | 0 | $700 | – | – |
| Collectors | 6 | 2 | $700 | $625 | 89.3 |
| Computer Operators | 7 | 1 | $642 | $500 | 77.9 |
| Secretaries | 5 | 0 | $608 | – | – |
| All Other Clerical Workers | 97 | 28 | $505 | $504 | 99.8 |
| All Other Employees | 5 | 1 | $542 | $500 | 92.3 |

41. The figures that are significant to the court in the tables immediately above are those under the category "all other clerical workers" constituting the vast majority of the people hired. The other categories would appear to be too small numerically and generally require specialized training or experience prior to hiring. Even in these small categories, we do not find significant differences in pay except for computer operators and secretaries, which could be explained by varying levels of experience and education. In the "all other clerical workers" there was a slight differential in favor of the blacks in 1974–75 and a slight differential in favor of the whites in later years. A fair and reasonable inference is that Union Bank was not guilty of discrimination

against blacks in their initial salary rate, and the court so finds.

42. Blacks in the Union Bank have been promoted at a higher rate than would be expected. For example at the beginning of 1974, 9.9% of the bank's work force was black. There were 75 promotions during that year and of those promotions, if the 9.9% of the blacks had received their share, we would have expected that blacks would have received 7.4% of the promotions. The observed rate was 14%, well over the expected rate. Promotion is defined as a change in job title accompanied by an increase in earnings. The figures for the entire 1974–80 are given in the following table:

| Year | Blacks as a Percent of UNB Work Force at the Beginning of the Year | No. of Promotions During the Year | Expected No. of Promotions Received by Blacks | Observed No. of Promotions Received by Blacks | Acceptable Range (No. of Promotions for Blacks) |
|------|------|------|------|------|------|
| 1974 | 9.9 | 75 | 7.4 | 14 | 2.2–12.6 |
| 1975 | 11.8 | 30 | 3.5 | 6 | 0.0– 7.0 |
| 1976 | 17.1 | 55 | 9.4 | 12 | 3.8–16.0 |
| 1977 | 16.0 | 42 | 6.7 | 11 | 1.9–11.5 |
| 1978 | 18.6 | 65 | 12.1 | 10 | 5.7–18.5 |
| 1979 | 17.7 | 73 | 12.9 | 21 | 6.4–19.4 |
| 1980 | 17.9 | 64 | 11.5 | 15 | 5.4–17.6 |
| Total | --- | 404 | 63.5 | 89 | --- |

43. There was no discrimination against blacks at the Union National Bank in the matter of promotions. As a matter of fact, in every year beginning in 1974, with the exception of 1978, blacks have been promoted at a far higher rate than would be expected. The difference in 1978 was insignificant.

44. Blacks at Union National Bank have also received a greater number of salary increases than would be expected on a statistical basis. In the following table change in position is not considered, but only whether an increase in pay was given:

1974–80

| Year | Blacks as a Percent of UNB Work Force at the Beginning of the Year | No. of Salary Increases During the Year | Expected Number of Salary Increases Received By Blacks | Observed Number of Salary Increases Received By Blacks | Acceptable Range (No. of Salary Increases for Blacks) |
|------|------|------|------|------|------|
| 1974 | 9.9 | 419 | 41.5 | 45 | 29.3– 53.7 |
| 1975 | 11.8 | 310 | 36.6 | 45 | 25.2– 48.0 |
| 1976 | 17.1 | 302 | 51.6 | 50 | 38.5– 64.7 |
| 1977 | 16.0 | 325 | 52.0 | 55 | 38.8– 65.2 |
| 1978 | 18.6 | 411 | 76.4 | 88 | 60.4– 92.4 |
| 1979 | 17.7 | 449 | 79.5 | 82 | 63.3– 95.7 |
| 1980 | 17.9 | 521 | 93.3 | 97 | 75.8–110.8 |
| Total | --- | 2737 | 430.9 | 462 | --- |

45. There has been no discrimination against blacks at the Union National Bank in reference to the number of salary increases given to black employees. Blacks received their share of upgrades whether an upgrade be defined as only a raise or a raise plus a change of position. The data suggests that blacks received a higher percentage of upgrades than would be expected statistically. There is no evidence of a disparate impact in the area of salary or promotion.

46. If we go further and delve into the mean change in monthly salary for employees receiving an increase in monthly salary rate or an increase with a change in job title at Union Bank in the 1974–80 period, we find that there is no significant difference in the figures for black and white employees. This conclusion is substantiated by Defendant's Exhibits 34(c) through 34(i) and 35(b) through 35(H).

47. If terminations of employees are considered, whether voluntary or involuntary, there is no significant difference in the number of blacks and whites terminating in the period 1974–80. This is illustrated by the following tables which take the terminations during each year and classify them according to how long the employees had been with the bank. This is a significant relationship because the longer a person has been with an employer, the less likely he is to terminate. In this series of tables *infra*, it is conclusively demonstrated that the higher number of blacks terminating is to be found in the short-term employees. For example, out of 28 blacks terminating in 1974, 17 had been hired that same year. Even so, in no year is the number of blacks terminating outside an acceptable range; actually, in each year the figure is almost exactly what would be expected. The tables follow:

1974

| Years of Hire | Black Employees Present in 1974 as a Percent of the Total | No. of Employees Terminating | Expected No. of Blacks Terminating | Observed No. of Blacks Terminating | Acceptable Range (No. of Blacks Terminating) |
|---|---|---|---|---|---|
| 1974 | 18.0 | 78 | 14.0 | 17 | 7.2–20.8 |
| 1973 | 16.4 | 53 | 8.7 | 8 | 3.3–14.1 |
| 1972 | 11.5 | 25 | 2.9 | 1 | 0.0– 5.1 |
| 1969–71 | 5.3 | 8 | 0.4 | 1 | 0.0– 1.7 |
| Prior to 1969 | 4.8 | 23 | 1.1 | 1 | 0.0– 3.1 |
| Total | --- | 187 | 27.1 | 28 | -- |

1975

| Years of Hire | Black Employees Present in 1975 as a Percent of the Total | No. of Employees Terminating | Expected No. of Blacks Terminating | Observed No. of Blacks Terminating | Acceptable Range (No. of Blacks Terminating) |
|---|---|---|---|---|---|
| 1975 | 40.2 | 29 | 11.7 | 14 | 6.4–17.0 |
| 1974 | 15.5 | 55 | 8.5 | 11 | 3.1–13.9 |
| 1973 | 17.5 | 20 | 3.5 | 2 | 0.1– 6.9 |
| 1970–72 | 10.9 | 10 | 1.1 | 1 | 0.0– 3.1 |
| Prior to 1970 | 5.3 | 10 | 0.5 | 0 | 0.0– 1.9 |
| Total | -- | 124 | 25.3 | 28 | -- |

1976

| Years of Hire | Black Employees Present in 1976 as a Percent of the Total | No. of Employees Terminating | Expected No. of Blacks Terminating | Observed No. of Blacks Terminating | Acceptable Range (No. of Blacks Terminating) |
|---|---|---|---|---|---|
| 1976 | 44.0 | 63 | 27.7 | 19 | 19.8–35.6 |
| 1975 | 29.0 | 38 | 11.0 | 15 | 5.4–16.6 |
| 1974 | 7.0 | 21 | 1.5 | 2 | 0.0– 3.8 |
| 1971–73 | 12.0 | 13 | 1.6 | 7 | 0.0– 3.9 |
| Prior to 1971 | 6.0 | 14 | 0.8 | 0 | 0.0– 2.6 |
| Total | --- | 149 | 42.6 | 43 | --- |

1977

| Years of Hire | Black Employees Present in 1977 as a Percent of the Total | No. of Employees Terminating | Expected No. of Blacks Terminating | Observed No. of Blacks Terminating | Acceptable Range (No. of Blacks Terminating) |
|---|---|---|---|---|---|
| 1977 | 25.8 | 87 | 22.4 | 24 | 14.2–30.6 |
| 1976 | 22.3 | 53 | 11.8 | 10 | 5.7–17.9 |
| 1975 | 35.0 | 11 | 3.9 | 5 | 0.7– 7.1 |
| 1972–74 | 10.0 | 19 | 2.1 | 2 | 0.0– 4.8 |
| Prior to 1972 | 7.1 | 14 | 1.0 | 1 | 0.0– 2.9 |
| Total | -- | 184 | 41.2 | 42 | -- |

1978

| Years of Hire | Black Employees Present in 1978 as a Percent of the Total | No. of Employees Terminating | Expected No. of Blacks Terminating | Observed No. of Blacks Terminating | Acceptable Range (No. of Blacks Terminating) |
|---|---|---|---|---|---|
| 1978 | 19.0 | 86 | 16.3 | 18 | 9.0–23.6 |
| 1977 | 24.7 | 68 | 16.7 | 14 | 9.6–23.8 |
| 1976 | 25.4 | 18 | 4.6 | 5 | 0.9– 8.3 |
| 1973–75 | 23.2 | 6 | 1.4 | 2 | 0.0– 3.5 |
| Prior to 1973 | 7.6 | 18 | 1.4 | 3 | 0.0– 3.6 |
| Total | -- | 196 | 40.4 | 42 | -- |

1979

| Years of Hire | Black Employees Present in 1979 as a Percent of the Total | No. of Employees Terminating | Expected No. of Blacks Terminating | Observed No. of Blacks Terminating | Acceptable Range (No. of Blacks Terminating) |
|---|---|---|---|---|---|
| 1979 | 20.4 | 82 | 16.7 | 16 | 9.4–20.0 |
| 1978 | 17.7 | 56 | 9.9 | 12 | 4.2–15.6 |
| 1977 | 28.2 | 30 | 8.5 | 8 | 2.6–13.4 |
| 1974–76 | 23.1 | 22 | 5.1 | 6 | 1.1– 9.1 |
| Prior to 1974 | 6.2 | 17 | 1.1 | 1 | 0.0– 3.1 |
| Total | --- | 207 | 41.3 | 43 | --- |

1980

| Years of Hire | Black Employees Present in 1980 as a Percent of the Total | No. of Employees Terminating | Expected No. of Blacks Terminating | Observed No. of Blacks Terminating | Acceptable Range (No. of Blacks Terminating) |
|---|---|---|---|---|---|
| 1980 | 21.3 | 55 | 11.7 | 14 | 5.6–17.8 |
| 1979 | 20.3 | 73 | 14.8 | 15 | 7.9–21.7 |
| 1978 | 15.9 | 18 | 2.9 | 3 | 0.0– 6.0 |
| 1975–77 | 25.8 | 15 | 3.9 | 4 | 0.5– 7.3 |
| Prior to 1975 | 6.3 | 14 | 0.9 | 4 | 0.0– 2.7 |
| Total | --- | 175 | 34.2 | 40 | --- |

48. A fair and reasonable inference from the tables set forth immediately *supra* is that there was no discrimination against blacks in the matter of terminations by the Union Bank and the court so finds. The court further finds that the proportion of whites hired to whites terminated in comparison to blacks hired to blacks terminated will necessarily result in a continuing increase of black percentages at the Union Bank (T. 2378–79). The relevant question of disparate impact in the matter of termination is whether the blacks and whites who have the same seniority have different

termination rates. We find that they do not.

49. The following figures represent the number of blacks discharged in a stated year with the percentage which discharges represent of the total terminations during the year: 1974, 26 (13.9%); 1975, 18 (14.5%); 1976, 17 (11.4%); 1977, 31 (16.8%); 1978, 27 (13.8%); 1979, 24 (11.6%); 1980, 28 (16%)—Total 171 (14%).

50. If we focus on the number of blacks discharged in the year 1974 to 1980, we find that there is a disproportionate number of black dischargees only where the blacks had been hired in the same year as the discharge. The tables which illustrate this fact are as follows:

1974

| Years of Hire | Black Employees Present in 1974 as a Percent of the Total | No. of Employees Discharged | Expected No. of Blacks Discharged | Observed No. of Blacks Discharged | Acceptable Range (No. of Blacks Discharged) |
|---|---|---|---|---|---|
| 1974 | 18.0 | 15 | 2.7 | 9 | 0.0–5.7 |
| 1973 | 16.4 | 9 | 1.5 | 2 | 0.0–3.7 |
| 1972 | 11.5 | 1 | 0.1 | 0 | 0.0–0.7 |
| 1969–71 | 5.3 | 0 | 0.0 | 0 | 0.0–0.0 |
| Prior to 1969 | 4.8 | 1 | 0.1 | 0 | 0.0–0.7 |
| Total | -- | 26 | 4.4 | 11 | -- |

1975

| Years of Hire | Black Employees Present in 1975 as a Percent of the Total | No. of Employees Discharged | Expected No. of Blacks Discharged | Observed No. of Blacks Discharged | Acceptable Range (No. of Blacks Discharged) |
|---|---|---|---|---|---|
| 1975 | 40.2 | 6 | 2.4 | 5 | 0.0–4.8 |
| 1974 | 15.5 | 7 | 1.1 | 2 | 0.0–3.0 |
| 1973 | 17.5 | 2 | 0.4 | 0 | 0.0–1.5 |
| 1970–72 | 10.9 | 2 | 0.2 | 1 | 0.0–1.1 |
| Prior to 1970 | 5.3 | 1 | 0.1 | 0 | 0.0–0.5 |
| Total | -- | 18 | 4.2 | 8 | -- |

## 1976

| Years of Hire | Black Employees Present in 1976 as a Percent of the Total | No. of Employees Discharged | Expected No. of Blacks Discharged | Observed No. of Blacks Discharged | Acceptable Range (No. of Blacks Discharged) |
|---|---|---|---|---|---|
| 1976 | 25.1 | 7 | 1.8 | 3 | 0.0–4.1 |
| 1975 | 37.0 | 6 | 2.2 | 4 | 0.0–4.6 |
| 1974 | 7.0 | 2 | 0.1 | 0 | 0.0–0.8 |
| 1971–73 | 12.0 | 0 | 0.0 | 0 | 0.0–0.0 |
| Prior to 1971 | 6.0 | 2 | 0.1 | 0 | 0.0–0.7 |
| Total | -- | 17 | 4.2 | 7 | -- |

## 1977

| Years of Hire | Black Employees Present in 1977 as a Percent of the Total | No. of Employees Discharged | Expected No. of Blacks Discharged | Observed No. of Blacks Discharged | Acceptable Range (No. of Blacks Discharged) |
|---|---|---|---|---|---|
| 1977 | 25.8 | 17 | 4.4 | 10 | 0.8–8.0 |
| 1976 | 22.3 | 10 | 2.2 | 6 | 0.0–4.8 |
| 1975 | 35.0 | 0 | 0.0 | 0 | 0.0–0.0 |
| 1972–74 | 10.8 | 3 | 0.3 | 1 | 0.0–1.4 |
| Prior to 1972 | 7.1 | 1 | 0.1 | 0 | 0.0–0.6 |
| Total | -- | 31 | 7.0 | 17 | -- |

## 1978

| Years of Hire | Black Employees Present in 1978 as a Percent of the Total | No. of Employees Discharged | Expected No. of Blacks Discharged | Observed No. of Blacks Discharged | Acceptable Range (No. of Blacks Discharged) |
|---|---|---|---|---|---|
| 1978 | 19.0 | 14 | 2.7 | 7 | 0.0–5.6 |
| 1977 | 24.7 | 7 | 1.7 | 2 | 0.0–4.0 |
| 1976 | 25.4 | 2 | 0.5 | 1 | 0.0–1.7 |
| 1973–75 | 23.2 | 2 | 0.5 | 0 | 0.0–1.7 |
| Prior to 1973 | 7.6 | 2 | 0.2 | 0 | 0.0–1.0 |
| Total | -- | 27 | 5.6 | 10 | -- |

1979

| Years of Hire | Black Employees Present in 1979 as a Percent of the Total | No. of Employees Discharged | Expected No. of Blacks Discharged | Observed No. of Blacks Discharged | Acceptable Range (No. of Blacks Discharged) |
|---|---|---|---|---|---|
| 1979 | 20.4 | 11 | 2.2 | 7 | 0.0–4.9 |
| 1978 | 17.7 | 7 | 1.2 | 2 | 0.0–3.2 |
| 1977 | 28.2 | 3 | 0.8 | 1 | 0.0–2.4 |
| 1974–76 | 23.1 | 1 | 0.2 | 0 | 0.0–1.0 |
| Prior to 1974 | 6.2 | 2 | 0.1 | 1 | 0.0–0.8 |
| Total | -- | 24 | 4.5 | 11 | -- |

1980

| Years of Hire | Black Employees Present in 1980 as a Percent of the Total | No. of Employees Discharged | Expected No. of Blacks Discharged | Observed No. of Blacks Discharged | Acceptable Range (No. of Blacks Discharged) |
|---|---|---|---|---|---|
| 1980 | 21.3 | 9 | 1.9 | 4 | 0.0–4.4 |
| 1979 | 20.3 | 13 | 2.6 | 7 | 0.0–5.5 |
| 1978 | 15.9 | 3 | 0.5 | 1 | 0.0–1.8 |
| 1975–77 | 25.8 | 1 | 0.3 | 0 | 0.0–1.0 |
| Prior to 1975 | 6.3 | 2 | 0.1 | 1 | 0.0–0.8 |
| Total | -- | 28 | 5.4 | 13 | -- |

51. We infer from the tables set forth immediately *supra* and other evidence in this case and so find that there is an over-representation of blacks among employees who have been discharged because Union Bank has been aggressive in its affirmative action policy and is accepting a lower standard for blacks as indicated by the overrepresentation of blacks among the bank's hirees. It is hiring blacks at two or three times the expected rate and is therefore taking greater risks on black employees than on white employees. This greater risk becomes particularly manifest in the short term employees, some of whom are simply not suitable employees, a fact the bank discovers after a short time. We find that this is a necessary concomitant where employment opportunity is being given to a disproportionate number of underqualified and undereducated people. If we look at the discharge rates of employees who have been at the bank for more than two years, there is no difference in the discharge rate of blacks and whites. We reject the hypothesis that the rate of discharge of blacks employed for only a short time indicates discrimination on the bank's part. If the bank wanted to discriminate against blacks in the matter of discharge, it is inconceivable that it would discriminate only against a certain small group—those who had been there only a short time.

52. The above finding is reinforced by statistical studies with regard to the warnings given to black and white employees prior to discharge. Whites were much more likely to be discharged with no prior warning whatsoever. In spite of smaller numbers, blacks were given substantially more warnings than whites prior to discharge. In other words, the bank was far more patient with the shortcomings of black employees than it was with those of white employees. This is illustrated by the following table for the years 1974–78:

| | | Whites | Blacks |
|---|---|---|---|
| 1. | Number of Employees Discharged, 1974–78 | 66 | 53 |
| 2. | Number of Employees Discharged Without Formal Prior Warning, 1974–78 | 41 | 16 |
| 3. | Percent of Employees Discharged Without Formal Warning, 1974–78 | 62.1 | 30.2 |
| 4. | Total Number of Formal Warnings Given to Discharged Employees, 1974–78 | 55 | 78 |
| 5. | Mean Number of Formal Warnings Given to Discharged Employees, 1974–78 | 0.83 | 1.47 |

If the employees fired without warning are classified according to reason for discharge, the whites exceed the blacks in every category except embezzlement/misappropriation (Def. Exhs. 49, F, F(1), F(2)). If we search deeper into the matter of warning prior to discharge and classify the discharges according to reason for discharge, we find that in each category the warning per discharge was higher for blacks than for whites, again indicating patience and tolerance on the bank's part toward its black employees and a reluctance to discharge them. This is illustrated by the following table:

| Reason for Discharge | No. of Employed Discharged for the Reason | | No. of Notifications Employees Received Warning of the Need for Corrective Action | | Warnings Per Discharge | |
|---|---|---|---|---|---|---|
| | White | Black | White | Black | White | Black |
| 1. Excessive Overdrafts | 8 | 4 | 7 | 12 | 0.88 | 3.00 |
| 2. Misappropriation of Funds | 1 | 5 | 0 | 0 | 0.00 | 0.00 |
| 3. Absenteeism & Tardiness | 13 | 7 | 8 | 19 | 0.62 | 2.71 |
| 4. Misconduct | 10 | 11 | 2 | 5 | 0.20 | 0.45 |
| 5. Inefficiency & Poor Performance | 25 | 24 | 29 | 30 | 1.16 | 1.25 |
| 6. Miscellaneous | 9 | 2 | 12 | 9 | 1.33 | 4.50 |

53. A statistical study of blacks voluntarily terminating their employment at Union National Bank, *infra* demonstrates that their voluntary termination in every year except one was less than the statistically expected rate. This study also demonstrates that most blacks voluntarily quit in the year of their hire:

1974

| Year of Hire | Black Employees Present in 1974 As a Percent of the Total | No. of Employees Quitting Voluntarily | Expected No. of Blacks Quitting | Observed No. of Blacks Quitting | Acceptable Range (No. of Blacks Quitting) |
|---|---|---|---|---|---|
| 1974 | 18.0 | 63 | 11.3 | 8 | 5.2–17.4 |
| 1973 | 16.4 | 44 | 7.2 | 6 | 2.3–12.1 |
| 1972 | 11.5 | 24 | 2.8 | 1 | 0.0– 5.9 |
| 1969–71 | 5.3 | 8 | 0.4 | 1 | 0.0– 1.7 |
| Prior to 1969 | 4.8 | 22 | 1.1 | 1 | 0.0– 3.1 |
| Total | -- | 161 | 22.8 | 17 | . -- |

<u>1975</u>

| Year of Hire | Black Employees Present in 1975 As a Percent of the Total | No. of Employees Quitting Voluntarily | Expected No. of Blacks Quitting | Observed No. of Blacks Quitting | Acceptable Range (No. of Blacks Quitting) |
|---|---|---|---|---|---|
| 1975 | 40.2 | 23 | 9.2 | 9 | 4.5–13.9 |
| 1974 | 15.5 | 48 | 7.4 | 9 | 2.4–12.4 |
| 1973 | 17.5 | 18 | 3.2 | 2 | 0.0– 6.4 |
| 1970–72 | 10.9 | 8 | 0.9 | 0 | 0.0– 2.7 |
| Prior to 1970 | 5.3 | 9 | 0.5 | 0 | 0.0– 1.8 |
| Total | -- | 106 | 21.2 | 20 | -- |

<u>1976</u>

| Year of Hire | Black Employees Present in 1976 As a Percent of the Total | No. of Employees Quitting Voluntarily | Expected No. of Blacks Quitting | Observed No. of Blacks Quitting | Acceptable Range (No. of Blacks Quitting) |
|---|---|---|---|---|---|
| 1976 | 25.1 | 56 | 14.1 | 16 | 2.6–20.6 |
| 1975 | 37.0 | 32 | 11.8 | 11 | 6.3–17.3 |
| 1974 | 7.0 | 19 | 1.3 | 2 | 0.0– 3.5 |
| 1971–73 | 12.0 | 13 | 1.6 | 7 | 0.0– 3.9 |
| Prior to 1971 | 6.0 | 12 | 0.7 | 0 | 0.0– 2.3 |
| Total | -- | 132 | 29.5 | 36 | -- |

<u>1977</u>

| Year of Hire | Black Employees Present in 1977 As a Percent of the Total | No. of Employees Quitting Voluntarily | Expected No. of Blacks Quitting | Observed No. of Blacks Quitting | Acceptable Range (No. of Blacks Quitting) |
|---|---|---|---|---|---|
| 1977 | 25.8 | 70 | 18.1 | 14 | 10.8–25.4 |
| 1976 | 22.3 | 43 | 9.6 | 4 | 4.1–15.1 |
| 1975 | 35.0 | 11 | 3.9 | 5 | 0.7– 7.1 |
| 1972–74 | 10.8 | 16 | 1.7 | 1 | 0.0– 4.2 |
| Prior to 1972 | 7.1 | 13 | 0.9 | 1 | 0.0– 2.8 |
| Total | -- | 153 | 34.2 | 25 | --- |

1978

| Year of Hire | Black Employees Present in 1978 As a Percent of the Total | No. of Employees Quitting Voluntarily | Expected No. of Blacks Quitting | Observed No. of Blacks Quitting | Acceptable Range (No. of Blacks Quitting) |
|---|---|---|---|---|---|
| 1978 | 19.0 | 72 | 13.7 | 11 | 7.0–20.4 |
| 1977 | 24.7 | 61 | 15.1 | 12 | 8.4–21.8 |
| 1976 | 25.4 | 16 | 4.1 | 4 | 0.6– 7.6 |
| 1973–75 | 23.2 | 4 | 0.9 | 2 | 0.0– 2.6 |
| Prior to 1973 | 7.6 | 16 | 1.2 | 3 | 0.0– 3.3 |
| Total | -- | 169 | 35.0 | 32 | --- |

1979

| Year of Hire | Black Employees Present in 1979 As a Percent of the Total | No. of Employees Quitting Voluntarily | Expected No. of Blacks Quitting | Observed No. of Blacks Quitting | Acceptable Range (No. of Blacks Quitting) |
|---|---|---|---|---|---|
| 1979 | 20.4 | 71 | 14.4 | 13 | 7.6–21.2 |
| 1978 | 17.7 | 49 | 8.7 | 10 | 3.4–14.0 |
| 1977 | 28.2 | 27 | 7.6 | 7 | 2.9–12.3 |
| 1974–76 | 23.1 | 21 | 4.9 | 6 | 1.0– 8.8 |
| Prior to 1974 | 6.2 | 15 | 0.9 | 0 | 0.0– 2.8 |
| Total | -- | 183 | 36.5 | 36 | --- |

1980

| Year of Hire | Black Employees Present in 1980 As a Percent of the Total | No. of Employees Quitting Voluntarily | Expected No. of Blacks Quitting | Observed No. of Blacks Quitting | Acceptable Range (No. of Blacks Quitting) |
|---|---|---|---|---|---|
| 1980 | 21.3 | 46 | 9.8 | 10 | 3.5–16.1 |
| 1979 | 20.3 | 60 | 12.2 | 8 | 6.0–18.4 |
| 1978 | 15.9 | 15 | 2.4 | 2 | 0.0– 5.2 |
| 1975–77 | 25.8 | 14 | 3.6 | 4 | 0.3– 6.9 |
| Prior to 1975 | 6.3 | 12 | 0.8 | 3 | 0.0– 2.5 |
| Total | -- | 147 | 28.8 | 27 | --- |

54. The court finds from the study immediately *supra* and from other evidence in this case that the black employees of Union Bank are not perceiving that their own employment opportunities are being unduly restricted at the bank.

55. We have examined the individual reasons for the discharges of the white and black employees of Union Bank during the period 1974–80. We have gone further and examined the employment summaries of the blacks discharged during the period. We find that the discharges of both white and black employees were justified by the bank management. We further find that the discharge of the black employee was not

racially motivated but fully justified by the information appearing in their personnel files (Def. Exhs. F F(1) and F(2)).

56. Using regression analysis, a recognized statistical tool,[1] it can be statistically determined whether pay differential between blacks and whites at Union Bank is based on race or other factors. The monthly earnings of blacks and whites at year end of 1978 were subjected to a regression analysis in which the factors of race, schooling, seniority, part-time status and prior work experience were considered. The results of this analysis by Dr. Gwartney were as follows:

| | Mean Value | | Regression Dependent Variable = Earnings (Standard Error in Parenthesis) | |
|---|---|---|---|---|
| Variable | Whites | Blacks | (1) | (2) |
| Race (work force = 17.9% black) | 0.0 | 1.0 | –$213.35 (64.92) | –$ 4.19 (46.77) |
| Years of Schooling | 13.5 | 13.1 | . | 27.51 (15.24) |
| B.A. Degree (1 if yes) | 0.22 | 0.11 | | 98.19 (69.98) |
| M.A. Degree (1 if yes) | 0.03 | 0.00 | | 135.54 (132.06) |
| Months of Seniority | 64.6 | 28.4 | | 40.80 (3.93) |
| Part-time Work (1 if No., i. e. if full-time) | 0.06 | 0.13 | | 126.57 (69.48) |
| Months of Bank Management Exp. | 2.7 | 0.0 | | 83.44 (12.79) |
| Months of Other Management Exp. | 6.0 | 0.0 | | 89.73 (8.43) |
| Months of Computer Spec. Exp. | 1.1 | 0.5 | | 77.16 (18.07) |
| Months of Accounting Exp. | 0.7 | 0.0 | | 36.23 (24.07) |
| Months of Collector Experience | 0.8 | 0.1 | | 88.34 (22.29) |
| Months of Professional/Technical Experience | 2.9 | 0.3 | | 24.21 (12.99) |
| Y-Intercept | | | 854.42 | |
| $R^2$ (adjusted) | | | .02 | .52 |
| Number of Employees | | | 402 | 402 |
| Adjust B/W Earnings Ratio (%) | | | | 99.5% |

57. Based upon a regression analysis and other evidence in this case, we find that the earnings of blacks and whites who have similar types of qualifications at the Union National Bank are the same. There is no discrimination between blacks and whites at the bank as far as earnings are concerned. Earnings differentials result from unequal education, seniority and prior work experience. Another factor in promotions and

1. Regression analysis is widely used by scientists to measure the importance of a set of factors (independent variables) as determinants of a single dependent variable. It is fully explained in Defendant's Exhibit 50, an exhibit to the testimony of Dr. James Gwartney.

pay at the bank is work performance. Based on the evidence in this case, we find that bank officials have been even-handed in their application of this factor between blacks and whites. This factor is, however, difficult if not impossible to statistically evaluate.

58. From time to time the bank utilized the services of Dr. Roy C. Long, a qualified clinical psychologist, to administer psychological tests to prospective and present employees of Union National Bank. These tests were administered to both blacks and whites. As a result of the tests, Dr. Long placed the person in one of three categories: (a) recommend, (b) recommended for consideration, or (c) not recommended. Only one of the parties to this litigation was tested by Dr. Long—Melvin Paxton. He was placed in category (b). Based upon a statistical analysis of Dr. Long's test results (Def. Exh. 52) and upon Dr. Long's extensive testimony in this case, we do not find that Dr. Long's testing procedures or conclusions had a disparate impact upon blacks.

59. None of the plaintiffs or intervenors are proper representatives of any class or subclass pursuant to Rule 23, Fed.R.Civ.P.

60. On a factual basis the requirements of Rule 23(a), Fed.R.Civ.P., have not been met by the plaintiffs and intervenors.

61. On a factual basis the plaintiffs and intervenors have failed to prove a prima facie case of discrimination against the defendant bank.

62. Even assuming that plaintiffs and intervenors have made a prima facie case, the defendant has with respect to each of them articulated a legitimate, nondiscriminatory reason for its actions.

63. None of the reasons mentioned in finding No. 64 were a pretext for discrimination.

## MELVIN PAXTON

1. Melvin Paxton was hired by the bank on August 14, 1975 at a salary of $400.00 per month. He was a member of the first banking class operated by Union National Bank in conjunction with the Opportunities Industrialization Center, mentioned *supra*. He was assigned to the Southwest Branch as a teller trainee under Lloyd Walker, Branch Manager. On December 19, 1975 he was transferred to the Auto Branch Downtown. On January 1, 1976 he was given a salary increase to $435.00 per month. On March 1, 1976 he was transferred to the Medical School Branch, Wayne Greathouse, Manager.

2. Melvin Paxton was not hired as a management trainee (T. 384). He was made no promises by responsible bank officials that he would receive any training except as a teller (T. 393). Management trainees are put through a certain rotating employment routine at Union Bank. Paxton was never put through this routine (T. 362) and never was a management trainee nor was he told that he was a management trainee by bank officials.

3. In the fourth quarter of 1975 and the first quarter of 1976, Melvin Paxton had the worst outage record of any of the 60 tellers in the Union National Bank (Def. Exh. KK). His ratio to total daily difference for the two quarters was 14.25%—far in excess of any other teller in the bank. The nearest to him had a 10.24% ratio. Of the fifteen worst tellers in the bank in respect to outages, ten had a ratio between two and five percent. We find that Paxton's outage record was not only bad but exceptionally bad.

4. As a result of his bad outage record, Paxton was refused a salary increase on March 19, 1976 (Def. Exh. H).

5. On January 30, 1976 Mr. Paxton while a teller at the Downtown Auto Bank made a customer deposit of $61.00 into his own account. On February 5, 1976 and after having been advised of his January 30, 1976 error, he did the same thing with a $25.00 customer deposit. (Def. Exh. E) It is a violation of Union Bank rules for a teller to handle any transaction with his own account. To place a customer's deposit in the teller's own account is a serious infraction of bank rules (T. 462).

6. According to Mr. Paxton's last supervisor at the bank, Mr. Wayne Greathouse, Paxton's work as a teller was unsatisfactory, which evaluation was reported to the bank's personnel office (T. 650).

7. The bank was justified in refusing a pay increase to Melvin Paxton on March 19, 1976. This refusal was not based on race but on Paxton's poor performance as a teller.

8. On April 2, 1976 Mr. Paxton went on vacation and on the same date filed this lawsuit as well as a complaint with the EEOC. The bank first learned about these actions from the newspapers.

9. When Paxton returned from his vacation on April 16, 1976, Mr. Zegler, the Personnel Manager, told his supervisor to have Paxton come to Zegler's office for an interview, the purpose of which was to ascertain why Paxton had complaints against the bank. Paxton became very angry during this interview, abruptly left Zegler's office, took off his bank logo pin and threw it in the direction of Ms. Charlotte Johnson, a black employee in the personnel office. He did not return to his post as a teller at the Medical School Branch either that day or the next several days. On April 20, 1976 Zegler wrote Paxton a letter stating that the bank interpreted his actions to be a resignation.

10. The court finds that Paxton did voluntarily resign from Union National Bank and was not discharged. We further find that the resignation was in no wise the result of discriminatory action on the part of the bank. In fact, we find that the bank was very tolerant toward this man in view of his extremely bad work record and serious breach of bank rules on two occasions.

11. The court finds that Paxton's failure to receive promotions and salary increases was due solely to his poor work performance and was entirely unrelated to his race.

12. Paxton never performed the duties of branch manager at the Union National Bank, and his statement in the EEOC complaint in this respect is untrue.

## KATRINA TERRY

1. Katrina Terry was hired as a Vault Clerk in the installment loan department at $400 per month on August 25, 1975. She, like Melvin Paxton, was in the first banking class operated by Union National Bank in conjunction with the Opportunities Industrialization Center, mentioned *supra*.

2. On February 20, 1976 her division head wrote a memorandum to the Personnel Department recommending that she not be considered for promotion because of her poor attitude, procrastination in her duties, and generally poor work performance (Def. Exh. V).

3. Mrs. Aleene Giger, Installment Loan Collection Officer, also complained about the work performance of Katrina Terry in a memorandum to personnel. She criticised her lack of interest in her job, extended lunch breaks, failure to stay at her desk and answer the phone, and unauthorized visitation in other departments (Def. Exh. V). Mrs. Giger confirmed and expanded on her memorandum in testimony at the trial. In addition to the above criticisms, Mrs. Giger stated that she did a poor job at keeping the vault neat and orderly, that she misfiled documents and left collateral loose in the vault.

4. On April 17, 1976 Mr. Akers, Ms. Terry's division head, wrote the personnel office that he found it necessary to admonish Katrina Terry in "rather strong terms as the result of some things that have been going on for some time." These were enumerated as follows:

1. Taking more than allotted time for lunch;

2. Loitering outside the department entrance and in the hallway;

3. Injecting herself into a decision made by a loan officer in regard to a black female customer. The loan was being declined, and Ms. Terry went over to the loan officer's desk and asked the customer if the loan officer were giving her a hard time.

The incident enumerated in (3) was corroborated in testimony by Bob Hogan, one of

the loan officers. In her own testimony Ms. Terry admitted this incident but said she was only making "a friendly comment." We find that the incident related in paragraph (3) of the Akers' memo did occur. We further find on the basis of the memo by Akers, the Giger Memo and other evidence in the case that Katrina Terry's work performance was poor.

5. On May 4, 1976 Katrina Terry was placed on disciplinary probation because of excessive absences. The court finds that her absences were excessive and that the bank was justified in placing her on probation.

6. On July 1, 1976 Ms. Terry resigned from the bank voluntarily. The court finds that the resignation was not prompted by any discriminatory actions on the part of the bank.

7. In her testimony Ms. Terry frankly stated that she was qualified to be a loan officer at the bank "after three months in the loan vault." She also testified that she could perform the job of the personnel director, Mr. Zegler, that she was qualified to be a trust officer, and could be quickly trained to be a computer programmer. She also said that she felt she could perform the job of Mr. Herbert McAdams, Chairman of the Board, "because the higher you go the less there is to do." The thrust of Ms. Terry's testimony was that she felt the bank was remiss in failing to recognize her considerable talents during the ten months of her employment with the bank. In spite of her personal assessment of her abilities, we find nothing in her job performance record that would qualify her for advancement at the bank. In short, we find that the failure of Ms. Terry to advance in Union National Bank was due to her own poor work performance and attitude. It was entirely unrelated to her race.

## GEORGE SPANN

1. George Spann was hired by the Union National Bank on August 30, 1973 as a part-time messenger in the mail room for $1.65 per hour, which was increased to $2.00 on May 1, 1974. On July 1, 1974 he was made a full-time employee in the Transit Department as Recordak operator and Branch Runner, Salary Group 4, at $350.00 per month. His salary was increased to $395 per month on December 16, 1974 at which time he was promoted to Control Clerk, Salary Group 5. On November 16, 1975 his salary was increased to $420 per month. On March 31, 1976 Mr. Spann resigned. (Def. Exh. Y)

2. Mr. Spann's complaint at the bank was that he did not receive sufficient raises and promotions (T. 1417).

3. The personnel records at the bank reflect that on January 14, 1975 his supervisor talked to him "to make him more aware that he has now been transferred to a new position, and that he must now learn his new job." According to the supervisor, "He spends a lot of his time in the Mail Room visiting his friends, leaving work for others to do." (Def. Exh. Z)

4. On March 20, 1975 his supervisor talked to him and "told him that it will be necessary to spend more time with his present job and stay out of other departments." The supervisor made the following additional comments in a memorandum to personnel: "He still needs lots of help. He was asked if he was even interested in the job. He said he guessed so but might like something else. At this time there are no other openings for him to try." (Def. Exh. Z)

5. On June 12, 1975 Spann was the subject of the following memo from his supervisor to the personnel department:

Once again we have had to talk with employee George Spann. The other employees who have been staying late with him are complaining that they are tired of trying to help him. He has been told that he will be left on his own after Monday June 16, 1975 to do his job, and if he is unable to do this job, then he will be dismissed.

6. On January 9, 1976 Spann was the subject of the following memo from his supervisor to personnel:

Today I had a talk with Proof Control employee, George Spann, about the amount of time that he misses from work. He has been missing at least one to two days per month. He calls in sick. He states that he has not been aware of the amount of time involved that he has missed.

7. During the two and one-half years that Spann was with the bank, he received four salary increases and two promotions. We find that these salary increases and promotions were more than commensurate with the quality of his work performance and that he was treated fairly by the bank both in the matter of promotions and salary increases.

8. Mr. Spann voluntarily resigned from his position at Union National Bank. His resignation was not the result of any discriminatory action on the part of the bank.

9. In his letter of resignation, Mr. Spann gave the reasons as follows: "I feel that my merit is higher than shown by my supervisor. My raises have been denied for several reasons. I have seen others that have been here shorter time than I, in my department, and salaries increased." The reasons given in this letter of resignation are not supported by the evidence in this case.

### HAROLD BROWN

1. Harold Brown applied for employment at the Union Bank on September 19, 1977 and was hired as a mail clerk-messenger at $425 monthly and began work the next day. In a routine background investigation, various discrepancies were found in the information provided in his application and interview. As a result he was discharged by the bank on September 23, 1977 after working three days. (Def. Exh. Q)

2. In Mr. Brown's offer and acceptance of employment at the bank, it is stated: "We conduct a thorough background investigation of all prospective employees. This includes your credit, police and employment record. This offer is contingent upon our receiving favorable reports. Unfavorable data could cause us to withdraw this offer." (Def. Exh. Q) Brown was given the following notification pursuant to Public Act 91–581:

This is to inform you that it is part of our procedure for employment, that an investigation may be made whereby information is obtained through personal interview with the third party, such as family members, business associates, friends, financial sources, neighbors, or others with whom you are acquainted. This inquiry includes information as to your character, general reputation, personal characteristics, and mode of living, that may be applicable. You have the right to make a written request within a reasonable period of time for complete and accurate disclosure of any additional information concerning the nature and scope of the investigation.

He executed the following agreement:

I hereby authorize Union National Bank or its agents to conduct such an investigation in connection with my application for employment, as may be necessary in their sole discretion. I authorize persons, schools, law enforcement agencies, firms, and medical practitioners who may have information that is relevant to the investigation, to disclose it to Union National Bank or its agents, and I release for all such from any liability on account of such disclosures. I understand that any false, incomplete or any misleading information furnished by me, on this form or in connection with my application for employment, may result in the rejection of my application, or if employed, in the termination of my employment.

/s/ Harold Dominic Brown

In the application form signed by Brown, the following appears:

I authorize the Bank to investigate all statements contained in this application. It is understood and agreed that any misrepresentations by me in this application will be sufficient cause for cancellation of the application and/or for separation from the Bank's services if I have been employed.

3. An investigation by a professional investigative agency regularly retained by the bank revealed that Brown had filed a Chapter 13 proceeding in a Bankruptcy Court at Little Rock for debts in the amount of $7,125; that a debtor's arrangement had been agreed to under which Brown would pay $225 per month to discharge his debts. He defaulted on payments under this arrangement, and the Chapter 13 protection was abrogated. He has been sued for unpaid bills and had a poor credit rating at the time of his employment.

4. When asked about his Chapter 13 petition and credit record, Brown told Mr. Zegler, the Personnel Director, that the Chapter 13 petition had been dismissed because he had satisfied all the obligations and that a suit filed by the credit union of his former employer, Westinghouse, had been satisfied. On further investigation the bank found that these representations were not true.

5. In a memorandum dated September 23, 1977, Mr. Zegler gave the following reasons for discharging Mr. Brown:

1. He had lived at three addresses not shown on his application.

2. The address given on one of his references was a vacant lot.

3. He said he had been divorced for three years. It was really two years.

4. He said he had been discharged from the Navy because of a heart murmur. The Navy said it was for "other than health reasons." His BD form 214 from the Navy did not list a reason for discharge.

5. He said he had satisfied his obligations on a 1975 bankruptcy. He had not.

6. He was sued by the credit union at Westinghouse for $5,900. No payment or arrangement for payments had been made. Harold denied having been contacted on the suit.

7. He is in debt over $14,000 with no apparent hope of repayment.

While some of the above reasons standing alone would not justify Brown's discharge, viewed cumulatively they do present ample justification for such action on the bank's part. The serious problem with Brown was his poor credit history and involvement in bankruptcy proceedings. We find that the bank has a legitimate interest in the credit history of its employees. We further find that a bank's concern is, and should be, heightened when an employee not only has a bad credit history but misrepresents the facts concerning it to the bank.

6. We find that the bank was justified in discharging Harold Brown on September 23, 1977 and that the reasons for his discharge were totally unrelated to his race.

### JERRY RILEY

1. Jerry Riley was hired by the bank as a messenger on September 22, 1976 at a salary of $400 monthly.

2. On December 31, 1976 he resigned to attend college on a full-time basis, according to his testimony. His signed resignation on file with the bank reflects that he resigned "due to family illness."

3. On July 1, 1977 he was rehired as a messenger at a salary of $425 monthly, Salary Grade 3.

4. On August 17, 1977 he placed a request for transfer to computer operator trainee.

5. On October 16, 1977 his salary was increased to $460 and on November 7, 1977 he was promoted to Control Clerk.

6. On December 8, 1977 his supervisor wrote the following memo to the Personnel Department:

I talked to Jerry Riley tonight about his work. He is not performing to the best of his ability. He is taking too long to do ILd. On 12–7–77 after having ILd separated by banks it took him two hours to check and pack it. The same night he left the Union ILd balance sheet out of balance by writing down the wrong totals.

I talked to him about learning to do some of the other jobs that is required of a

control clerk. He assured me he would do his job faster and learn to do something besides ILd.

However, a subsequent evaluation on January 17, 1978 indicated that he was average on most items.

7. On May 16, 1978 he was given a salary increase of $525 and on August 4, 1978 was evaluated as doing an average job.

8. He received a salary increase to $550 on November 1, 1978 and an increase to $600 on June 16, 1979.

9. On July 20, 1979 he was evaluated as doing an above-average job.

10. On July 30, 1979 he filed an EEOC charge because he was denied promotion to head control clerk.

11. On December 19, 1979 Riley's department head, Raymond Whittier conferred with Riley about two positions under consideration. One was a control clerk on the day shift, which Riley found unacceptable because it interfered with his college schedule. He decided upon the other position and was advised that he would be moved into it as soon as he trained his replacement. He was made a computer operator trainee on March 15, 1980. On March 16, 1980 he was given a salary increase to $650 plus a 15% night differential. The control clerk is Salary Grade 7 and a computer operator frame is Grade 8.

12. On June 18, 1980 Mr. Riley filed the following charge with the EEOC:

Since my transfer to computer operator trainee on Mar. 15 I have not received training as other trainees have. I have not received a salary increase equal to level of other trainees, I have been subjected to verbal abuse from supervisor personnel, also I have been called to listen to performance evaluation where others have not, I feel that this harassment has been caused by my 1st charge (retaliation).

13. On July 11, 1980 Riley's supervisor Whittier had a corrective counselling session with Riley. A memorandum of this conference contains the following critical comments:

I met with subject employee the afternoon of Friday, June 13. Judy Austin sat in.

The subject is a Trainee Computer Operator at this time. Based on the evaluations of subject's immediate supervisors, he is not presently meeting the standards for progress as a Trainee. It was the purpose of this meeting to make the subject aware of these deficiencies.

I reviewed a number of items with the subject. I mentioned that several weeks ago, approximately one month, it was observed that he was lax in reporting for work at his appointed time. I indicated though, that this had been improved and that currently he was reporting to work on time and working his normal hours. I indicated that while his main duties involved on the job training (OJT) it was necessary for him to spend any idle time he might have observing the other operators performing their duties. I indicated that it [had] been noted that he was absent for extended periods of time (up to two hours) without any permission from the Computer Room where he should have been observing the operators in action. There are periods of time during the processing night that it is not possible for him to actually operate the computer because of the necessities of production, but that at all times he can benefit from close observation. I indicated that on more than one occasion he had been observed "visiting" in another department during these absenses and that this could not continue if he was to make any progress at all in his training. I also noted that it seemed that although he took extensive notes as to his procedures, he did not refer to these notes when actually asked to perform and required frequent prompting by his trainers.

In short, I indicated that at this point, after some three months as a Trainee, he has not progressed to the point that we thought was reasonable. It appeared to us that regardless of the conditions that existed for his training that he should be

further along in exhibiting more independent action that he had been able to.

14. One of Riley's complaints was that two whites, Keith Gardner and Dave Newby, had been moved ahead of him and placed directly into computer operator positions. However, Gardner had three prior years of computer experience (two as a computer operator in another bank). Newby had five prior years of experience as a computer operator and is a computer science major at UALR. We find these complaints to be unjustified. There were also complaints about comparable progress of David New and Chuck Howland, both computer science college majors, which we find unjustified.

15. In Mr. Riley's department (computer operations) there are three supervisory employees and twenty-seven non-supervisory, for a total staff of thirty. Nine of the non-supervisory employees are black. One of the supervisors (Mike Mothershed) is black. Exactly one-third of the nonsupervisory employees are black and one-third of the supervisors are black.

16. In September 16, 1980 Riley was made a computer operator, and on February 1, 1981 he was given a salary increase to $800 monthly, salary group 11.

17. To recapitulate, since Mr. Riley was rehired by the bank on July 1, 1977, less than four years ago, he has received three promotions and eight salary increases. He is presently employed as a computer operator.

18. He did not progress as fast in learning his job as a computer operator as two whites (Chuck Howland and David New) or another black (Bobby Scott) during the training period as a computer operator trainee (see testimony of Mike Mothershed).

19. We find no credible evidence that Jerry Riley was subjected to racial discrimination at this bank as far as promotions and salary increases are concerned.

## PHYLLIS MOSLEY

1. Phyllis Mosley was employed by Union Bank as a file clerk at $425.00 monthly.

She was promoted to Junior Telephone Clerk on August 21, 1977 and on October 16, 1977 was given a $500 salary increase. She was given additional salary increases of $35 monthly on January 1, 1978, April 1, 1978 and March 16, 1979.

2. On March 29, 1979 bank statements were late and all file clerks and telephone operators stayed late to process them. Ms. Mosley told her supervisor that she had to catch a bus that was leaving at 5:25 p. m. Permission was refused by her supervisor, who told Ms. Mosley that she knew she would have to work late and should have made arrangements in advance for transportation. In spite of a direct order from her supervisor, Ms. Mosley left the bank and went home. Her explanation was that she lived twelve miles from Little Rock and the bus she left to catch was the last one available.

3. On Monday, April 2, 1979 Mr. Zegler, the personnel director, called Ms. Mosley to his office for a conference in regard to the March 29th incident. He advised her that her transportation was her problem and that the nature of the work in her area, as well as many other areas in the bank, necessitated working past 5:30 on occasion. She was told that if she ever again refused a reasonable order from her supervisor, she would be dismissed. (Def. Exh. A)

4. On this same day, April 2, 1979, Ms. Mosley again refused to obey a direct order of her supervisor. April 2nd was a commercial statement day and the end of the quarter for savings. It is one of the four heaviest days for the bank during the entire year. Again Ms. Mosley told her supervisor that she could not work past 5:25 p. m. and was going to leave. She was given a direct order to stay by her supervisor, which she deliberately disobeyed. She was then discharged by her supervisor (Def. Exh. M).

5. Ms. Phyllis Mosley was discharged for failing to obey a direct order of her supervisor on two occasions, after having been warned of the consequences of such refusal after the first occurrence. Race played no part in the termination of Ms. Mosley.

## CONCLUSIONS OF LAW

In *Texas Department of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 68 L.Ed.2d ——, decided on March 4, 1981, the Supreme Court approved the basic allocation of burdens and order of proof in a Title VII case as defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. These procedures are also applicable to disparate treatment claims brought pursuant to 42 U.S.C. § 1981. *Kenyatta v. Bookey Packing Co.,* 649 F.2d 552 (8th Cir. 1981).

In the case at bar, the plaintiffs and intervenors have utterly failed to prove a prima facie case of discrimination. Their own testimony impels an opposite conclusion. Assuming, however, that the plaintiffs and intervenors had made a prima facie case, the defendant has more than sustained its burden of articulating "some legitimate nondiscriminatory reason" for its employment decisions not only in regard to these six plaintiffs and intervenors but as to all other employees whose names have been suggested as putative discriminatees. We use the word "suggested" advisedly because in terms of other employees besides the six plaintiffs and intervenors there are only unsubstantiated and nonspecific charges of discrimination based on gossip and hearsay. If there is any proof in this record that the bank's personnel actions were a pretext for racial discrimination, we have failed to find it.

In the *Burdine* case, *supra* the Supreme Court makes it perfectly clear that, after the various shifts in the burden of going forward with the evidence, the ultimate burden of both proof and persuasion lies with the plaintiff to establish the existence of unlawful discrimination by a preponderance of the evidence. Clearly the plaintiffs and intervenors have failed to sustain this ultimate burden of proof or persuasion.

With regard to the class action allegations, the plaintiff in a purported class action must prove the following by a preponderance of the evidence: (1) the defendant's employment practices and procedures discriminated against members of a protected class; (2) the plaintiff is a member of the protected class; and (3) all the requirements of Rule 23(a) and one category prescribed in Rule 23(b) have been satisfied. *East Texas Motor Freight v. Rodriquez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). These plaintiffs and intervenors fail at the very outset because they have failed to prove employment practices and procedures of Union National Bank which discriminate against any class of their employees. It follows that these plaintiffs and intervenors could not be members of such a class. The requirements of Rule 23(a) have not been met. "Title VII plaintiffs are not exempted from the prerequisites of Rule 23(a). *Taylor v. Safeway Stores,* 524 F.2d 263, 269–70 (10th Cir. 1975). To satisfy the requirements of Rule 23, there must be a class of individuals raising the same claims or defenses too numerous for joinder and the plaintiff must be a representative of that class with a claim 'typical of the claims or defenses of the class' .... As stated, the burden of establishing these requirements rested on the plaintiff." *Doctor v. Seaboard Coast Line R. Co.,* 540 F.2d 699, 706–707 (4th Cir. 1976).

The four requisites of Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. We doubt that any of these requirements have been met. With regard to numerosity, there are presently 74 black employees at the bank out of a work force of 432. With the exception of intervenors Riley and Scott (who settled his case on the

eve of trial), no present black employees of Union National Bank testified that the bank had discriminated against them. A number of blacks presently employed at the bank gave testimony very favorable to the bank on the issue of discrimination—Bill Pierce, Mike Mothershed, Mildred Hall, Charlotte Johnson and Shirley Clingman. There hardly appears to be any great number of blacks at the bank who desire these plaintiffs to represent them in a class action or who would profit from such representation. In fact very few employees purportedly subject to discrimination have been identified. When they have been identified, the basis for the discrimination charge has been exploded either by other testimony, bank records, or testimony from the alleged discriminatees themselves. "It seems reasonable to conclude that the court will be in a better position to apply the requirement [numerosity] after it has performed the analysis under paragraphs (a)(2) through (4)." *Harriss v. Pan American World Airways, Inc.*, 74 F.R.D. 24 (N.D.Cal. 1977). If this procedure is followed herein, the numbers just about disappear.

Are there questions of law or fact common to the class these plaintiffs and intervenors seek to represent? Such has not been established. Paxton, the main plaintiff, resigned against a background of poor work performance and flagrant violation of bank rules. The other plaintiff, Brown, was fired after three days for misrepresentation in his employment application. One intervenor was fired for leaving her job on two successive work days in express disregard of her supervisor's orders. Two intervenors resigned after compiling a poor work record at the bank. One is still employed there. There is very little commonality in fact or law if we compare these individual cases with each other. We can find in this record little basis for holding that there is commonality with other discharge cases. We have examined the discharge records of the bank introduced in evidence in this case. Discharges were principally for excessive overdrafts, misappropriation of funds, absenteeism and tardiness, misconduct, inefficiency, and poor performance. The dis-

charge cases—Brown and Mosley—would seem to have little or nothing in common with the other discharges. Paxton, Spann and Terry resigned. People resign employment for a multitude of reasons. The proof has not been forthcoming that they have issues in law or fact common to other blacks who may have resigned from the bank. Spann and Terry claim that they resigned from the bank because of discrimination in promotions, but the evidence fails to substantiate this charge as to them or other black bank employees. The elements of commonality are summarized very well in *Harriss v. Pan American World Airways, Inc., supra* at p. 41. We find the elements there summarized to be lacking in the case at bar.

Proof of typicality is also lacking. "The typicality requirement of Rule 23(a)(3) obligates the class representative to at least demonstrate that there are other members of the class who have similar grievances." *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1062 (8th Cir. 1975). It must be concluded from the findings of fact set forth above that the requirement of typicality has not been met. It is not necessary to discuss the fourth requirement of Rule 23(a). It is hardly necessary to inquire as to whether these plaintiffs and intervenors could adequately represent a class when their proof has failed to delineate any class who should be represented.

In accordance with the above findings of fact and conclusions of law, judgment will be entered in favor of the defendant in these consolidated cases both as to the individual claims and the class allegations.